EDWARD M. BENTON AND JOSEPH H. HALL, PLAINTIFFS IN ERROR, v. THE STATE OF NEW JERSEY, DEFEND-ANT IN ERROR.

1. In an indictment for libel, it is the office of an innuendo to express and render certain the meaning of equivocal or uncertain language, or bring out some latent meaning in the words necessary to fix their defamatory character, or to explain to whom the defamatory language refers, where that is left uncertain; but where the words themselves are commonly enough understood, in a libelous sense, to warrant a jury in so applying them, no innuendoes need be inserted.

2. Motions to quash and in arrest of judgment for want of innuendoes and on the ground that the language is not libelous without them, should not be granted where the words are such that an inference might reasonably be drawn therefrom by the jury that the same are libelous.

3. A newspaper falsely charged a police officer with extortion in pur-posely swelling the amount of a prisoner's fine, collecting the same of the prisoner's family to procure his discharge and pocketing the differ-ence. *Held*, that such publication was libelous, and that even though it was made without malice or improper motives, and for the dis-semination of news and information to the citizens of the municipality, it did not thereby become privileged.

4. In a legal sense, any unlawful act, done willfully, to the injury of another, is, as against that person, malicious, and it is not necessary that the perpetrator of such act should be influenced by ill-will towards such person, or that he should entertain or pursue any general bad design.

5. Upon the trial of an indictment for such a libel, an instruction by the trial court that before a person published a libel he must take care to investigate fully all the circumstances and satisfy himself of their truth, otherwise he will not be permitted to come into court and say, "I had no malice in this matter; I didn't know who it was I was

publishing this against," while not precisely opportune, is upon the whole not unfavorable to a defendant upon such trial and is not reversible error.

6. The trial court having in its charge defined to the jury the nature and essence of a defamatory libel, it was no error for it to say, in another part of the charge, that under the state constitution the jury were the judges of the law and the fact, and that there was no need for the court to express to them any opinion as to whether the publication in question was libelous or not—that it was for them alone to say.

On error to the Supreme Court.

For the plaintiffs in error, *Howard Carrow* and *William J. Kraft.*

For the state, *Wilson H. Jenkins,* prosecutor of the pleas.

The opinion of the court was delivered by

HENDRICKSON, J.    This writ brings up from the Supreme Court for review a judgment of that court affirming a conviction of the plaintiffs in error in the Court of Quarter Sessions of Camden county, upon an indictment for libel based upon a publication in the "Camden Citizen," a newspaper, belonging to the plaintiffs in error, published in the city of Camden.

The newspaper article, as described in the indictment, reads as follows:

"CATCHING A 'FIVER.'·

"AN OFFICER SUCCESSFULLY WORKS THE EXTORTION ACT—MAKING DOLLARS OUT OF DRUNKS—AMOS MASON'S FINE OF $3.67 SWELLED BY FIVE DOLLARS AND THE DIFFERENCE POCKETED—THE OFFICER KNEW HE HAD MONEY HIDDEN.

"Does Camden need a Lexow investigation?    It certainly does.

"Here is one isolated case, of which the proofs are freshly in the possession of the 'Citizen.'    There are, beyond all doubt, hundreds of others:

"Amos L. Mason, an oyster and fruit dealer, of 2265

Howard street, Philadelphia, was locked up in this city, for intoxication, on Monday, November 26th. His fine was fixed by Mayor Wescott at $3.67. His family, however, paid $8.67 to an officer to get the old man out, yet only $3.67 of that amount found its way into the hands of the mayor.

"These two statements are printed upon the story of Mrs. Mason, a daughter-in-law of the arrested man, who will substantiate under oath, and upon the showing of the police records, which were specially consulted and the statement made that only $3.67 was imposed and collected.

### "PICKED UP A 'PERIODICAL.'

"There is no possibility of doubt that Mason was drunk, but he was making his way to the Shackamaxon ferry, en route for home. Mason is erratic and goes on a periodical spree about once a year or at longer intervals.

"On Saturday, November 24th, he provided himself with $50, and came to Camden. It was Monday morning when he fell into the clutches of Officer Kappel, of the First ward, and sent to the hall. At this point commences the story.

"Mason had run through his money and had no cash to pay the $3.67. He was sent back to the lockup, but his anxiety to regain his liberty induced him to impart to the officer who arrested him that he had over $100 hidden behind a brick in the wall of his banana cellar. This was one of the old man's peculiarities, of which his family were aware. Mason wanted to get out, and the officer consented to go to his home and get it.

### "FINDING THE MONEY.

"Two men walked into the oyster shop, at 2265 Howard street, on Monday afternoon. One was heavy set, of ruddy complexion and wore a knit jacket and a star. The other seemed to be his friend. Young Mrs. Mason met him.

"'Mrs. Mason at home?' they asked.

"'No, she isn't.'

"'Have you got a banana cellar here?' was the next ques-

tion. The star, the old man's periodical sprees and his habit of secreting money in the cellar resulted in a quick conclusion by Mrs. Mason.

"'He's locked up and you've come for money,' she exclaimed. 'What is the fine?'

"'Eight sixty-seven,' was the reply.

"'I don't think I have so much; my husband will be here shortly and he will fix it.'

"'Oh! there is money in the cellar.'

"'Do you know where it is?'

"'Yes, it's up in a joist over some lemon boxes.'

"The money could not be found there, and the men were called to look for it. They did not go near the boxes, but dove under the steps, and, pulling a brick, drew out a big roll of bills. Then they wanted to take it all over to Camden, but Mrs. Mason stopped that, and, taking the money in her apron, paid them the $8.67 and added the amount of their fare over.

"'Don't you think it's worth something for our trouble?'

"'How much do you think would be right?'

"'About a dollar apiece.'

"'Who arrested him?'

"'I did,' replied the man with the star.

"'Well, I'll go over and see about it myself,' decided Mrs. Mason, and put her things on, despite the efforts of the men to dissuade her. 'It was a fool's errand,' they said, and 'he would get out all right.' But she came over. She states that she overheard a whispered remark not intended for her ears, to the effect that she was too smart for them.

### "NOT FIT FOR THE FORCE.

"Arriving at the hall, the officer settled the fine while she waited. Mason also paid another man's fine out of other money brought over by his daughter-in-law. This exposed the fact that the usual fine was $3.67. Mrs. Mason states that the officer paid $3.67 for her father's fine, and kept $5 for himself, besides his expenses.

" It's more than likely that Mayor Wescott is not aware of this little transaction; if not, he has only to look into the matter to verify these facts. An officer may be good in every other way, but if he resorts to extortion of this kind, the police force is not the place for him. He is a fit subject for a Lexow committee, and of his fate in such hands there is no doubt, and he has only himself to thank."

The legality of the conviction is now challenged under the errors assigned, because the trial court refused the motions that were made to quash the indictment and arrest the judgment, and also for alleged errors in the charge and in refusing certain evidence offered.

In support of the first ground of challenge, it is insisted that the indictment fails to disclose upon its face the offence of criminal libel, in that the language imputed to the plaintiffs in error is not libelous *per se,* and, not being libelous *per se,* is not so explained by the insertion of the necessary innuendoes as to render the publication libelous.

No exception is taken to the general form of the indictment, which charges in the usual language the publication of the alleged libel by the plaintiffs in error. It charges, among other things, that the publication complained of was made of and concerning George Kappel, a police officer of the city of Camden.

It is perceived that, by its head-lines, the article charges in substance that the officer in question was guilty of extortion in swelling a prisoner's fine of $3.67 cents for being drunk, by adding $5 thereto and pocketing the difference. It would seem proper, in determining whether a publication is libelous *per se,* that the head-lines of the article should be considered, and it has been so held.  *Landon* v. *Watkins,* 63 *N. W. Rep.* 615.

In giving the details of the story, the officer is charged with obtaining from the daughter-in-law of the prisoner the $5 in addition to the fine, by the false and fraudulent pretence that the fine was greater by $5 than it in fact was.

The whole story, if true, indicated that the officer had been guilty of conduct not only criminal, but dishonest and disgraceful to an extent that would justly expose him to the scorn and contempt of every good citizen.

It is the language of authority that any written or printed words are libelous which impute to a person that he has been guilty of any crime, fraud, dishonesty, immorality, vice or dishonorable conduct, or which have a tendency to injure him in his office, profession, calling or trade.

The charges made by this article are so clearly within the range of criminal libel, as thus defined, that further discussion on this point seems unnecessary.

It is equally plain that no valid objection lies to the fact that there are no innuendoes set forth in this indictment in connection with the libelous words. The office of an innuendo, in such a connection, is to express and render certain the meaning of equivocal or uncertain language or to bring out some latent meaning in the words necessary to fix their defamatory character. It has a further office—to explain to whom the defamatory language refers where that is left uncertain without it.

But the doctrine is well settled that when the plain, natural meaning of the words is libelous, no innuendo is required. *State* v. *Mott*, 16 *Vroom* 496; *Rex* v. *Burdett*, 4 *Barn. & A.* 314; *Hoare* v. *Silverlock*, 12 *Ad. & E.* (*N. S.*) 624; *Croswell* v. *Weed*, 25 *Wend.* 621.

And where written or printed matter in itself imports a libel on a person, no statement of extrinsic circumstances by way of inducement is necessary. It is no objection, therefore, in arrest of judgment, that words are not explained by an innuendo where they are commonly enough understood in a libelous sense to warrant a jury in so applying them. 1 *Russ. Cr.* (*9th Am. ed.*) 353.

Judged by this rule, it will appear that no innuendoes were required to render this publication libelous, and since the article itself mentions Officer Kappel, of the First ward, as the officer who made the arrest in question, and whose alleged

extortion is thereby held up to the scorn of the public, there is clearly sufficient on the face of the indictment from which the jury might reasonably infer that the libelous words were aimed at the officer named.

There was no error, then, in the trial court's refusal to quash the indictment or to arrest the judgment on the grounds alleged.

It may be added that, in view of our constitutional provision (article 1, section 5) making the jury the judges of the law as well as the fact as to whether the language used in a given case is libelous, the court could not grant a motion to quash or a motion in arrest of judgment upon the ground that the publication was not libelous so long as the language thereof was such that an inference might reasonably be drawn therefrom by the jury that the words were within the definition of libel as laid down by the court.

This view is in accord with the decisions. *State* v. *Schmitt,* 20 *Vroom* 585; *Commonwealth* v. *Wolfinger,* 16 *Pa. Co. Ct. Rep.* 257.

The next contention is that the trial court erred in charging the jury, among other things, the following: " In passing upon this libel, it is entirely your province to say whether or not it is a libel. You have heard the state constitution on the subject of prosecutions for libel several times, and I will not repeat them. You will remember at the end it says that the jury shall be the judges of the law and of the fact, and so I do not need express to you any opinion as to whether or not this paper—this article which is set out—is libelous or not. It is for you to say, and for you alone."

No exception was taken to that part of the charge wherein the court had defined to the jury the meaning of defamatory libel, and taking in connection therewith the part of the charge here excepted to, I can see nothing erroneous.

It is the province of the court, in a trial for criminal libel, to instruct the jury as to the nature and character of libel, and it is the province of the jury, under such instructions of the court, to find whether the publication complained of is libelous or not. *Drake* v. *State.* 24 *Vroom* 23.

This is, in substance, what the trial court did in this case.

It is also insisted that the court erred in charging the following : "A man who puts a libel out, before he does it, must take care to investigate carefully all the circumstances, and satisfy himself of their truth, otherwise he will not be permitted to come into court and say, ' I had no malice in this matter ; I didn't know who it was I was publishing this libel against.' "

This statement of the trial court is part of the instructions given to the jury with reference to one of the defences set up upon the trial, which was that the publication in question was privileged as having been made upon information obtained by them in good faith as to the doings of a public officer and in the honest belief of its truth.

Now, when privilege is set up as a defence to the charge of libel, it is held to be proper for the judge to ask the jury whether the matter was published *bona fide,* and if they find that it was, then it is for the judge to say whether the privilege is made out.   2 *Whart. Cr. L.* 1642.

It is further held that privilege cannot protect where malice or negligence is shown.   2 *Whart. Cr. L.* 1636 ; *Commonwealth* v. *Singerly,* 15 *Phila.* 368.

Upon this question of the good faith of the plaintiffs in error in making the publication complained of, and of the presence or absence of malice in the act, I think this part of the charge to the jury is not subject to legal criticism.   If the matter complained of was not privileged, then this part of the charge could not possibly be injurious to the defendants below, who, to make good their defence, must, in that case, not only show good faith, but must establish the absolute truth of the libelous words.

The next question to be disposed of is an insistment of the counsel of the plaintiffs in error that the publication complained of was privileged, and that there being no proof of actual malice on the part of the publishers, the court should have taken the case from the jury and ordered an acquittal of the defendants.

This question now insisted upon does not properly arise upon the record before us. The nearest approach to it is an exception to the court's refusal to charge the following request: " That if the jury find from the evidence that the publication was made without malice or improper motives, and that the publication was made for the dissemination of news and information to the citizens of Camden generally, then the article is privileged and defendants must be found not guilty."

This exception cannot be sustained for the obvious reason that the publication in question is not within any of the classes of privileged communications as established under the constitution and laws of this state. The cases cited by counsel from the reports of Pennsylvania in support of this exception have but slight application here, because, under the constitution of that state, as amended in 1874, it is provided, among other things, that " no conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact, if such publication was not maliciously or negligently made, shall be established to the satisfaction of the jury."

Our constitution does not contain such a provision as this, but leaves the *status* of privileged communications the same as at common law, except that the truth may now be given in evidence in justification, where it appears that the publication is made with good motives and for justifiable ends.

The question arises, therefore, whether, under our laws, the occasion of the publication in question was a privileged one.

The burden was upon the defendant to show that it was within the class of communications having a qualified privilege. *King* v. *Patterson*, 20 *Vroom* 417 ; *Fahr* v. *Hayes*, 21 *Id*. 275.

The evidence shows, and it is admitted, that the libelous statements in the above publication, so far as they apply to Officer Kappel, were absolutely untrue, and that he did nothing more than make the arrest and bring the prisoner before

the mayor, who imposed the fine and committed the prisoner until the fine and costs, amounting to $3.67, were paid. It further shows that the prisoner, at the lockup the next morning, being anxious for his release, secured the services of an employe of the city in the water department to go to the house of the prisoner's son in Philadelphia to get the money necessary to pay the fine and costs, informing his messenger where the money could be found in the banana cellar, and promising to pay him $5 for his trouble. The messenger took a friend with him and performed his errand substantially as stated in the article published, the facts of which were obtained by the plaintiffs in error from the daughter-in-law of the prisoner before the publication was made. The informant did not state the names of the persons who called upon her with regard to the arrest of her father-in-law, as the publication also shows, and it is quite probable that the publishers reached a conclusion in their own minds, from the circumstances, that the officer who made the arrest was the one who called and obtained the money as stated from the prisoner's daughter-in-law.

Arguing from these facts, the plaintiffs in error insist that the case is one of qualified privilege, and that they acted in good faith and without actual malice, and therefore that the refusal of the court to instruct the jury as requested was such error that the judgment should be reversed.

I cannot accede to that view of the law.

"While the acts of a public officer may be fully criticised, and the act itself may be a target for the shafts of sarcasm and ridicule, and the occasion will excuse everything in the attack except actual malice, yet the occasion will not of itself permit the character and motive of the officer to be assailed, unless the assailant shall show the truth of what he has uttered." 13 *Am. & Eng. Encycl. L.* 419.

To accuse one holding a public office, of an offence, is not privileged, and if the charge be false the utterer is liable, however good his motives, and this although the libel relates to an act of the officer in discharge of his official duties.

13 *Am. & Eng. Encycl. L.* 419 ; *Curtis* v. *Mussey,* 6 *Gray* 261 ; *Hamilton* v. *Eno,* 81 *N. Y.* 116.

It will be perceived that the libelous words in this case are entirely outside of the above rule as to qualified privilege, in that they do not, in fact and in truth, refer to a single act of the officer accused. Nor does the case of the plaintiffs in error present any better claim to relief, on the ground that they made the charges against the prosecutor by accident or mistake. The words are actionable, if false and defamatory, although spoken or published accidentally or inadvertently, or with an honest belief in their truth. *Odg. Lib. & S.* 5 ; 2 *Bish. Cr. L.* (*N. S.*) 922 ; 13 *Am. & Eng. Encycl. L.* 385, 386.

Chief Justice Shaw, in *Commonwealth* v. *Snelling,* 15 *Pick.* 337, has well stated the principle underlying this doctrine in the law of libel. His statement is summed up in the syllabus, as follows : " In a legal sense, any unlawful act, done willfully to the injury of another, is, as against that person, malicious ; and it is not necessary that the perpetrator of such act should be influenced by ill-will towards such person, or that he should entertain or pursue any general bad design."

The publication, not being privileged, could not be successfully justified except by proving the truth of the statements therein, and hence it would seem to be unnecessary to touch upon the question of the good faith of the authors of the publication. It may be remarked, however, in passing, that good faith under such circumstances requires something more than good motives ; it requires of the authors before making such a publication, when privileged, the exercise of due care in making all proper inquiries to ascertain the truth of its statements. It appears that no inquiry was made beforehand of Mr. Kappel, the officer involved, nor of the mayor of the city, although both were readily accessible. It is noticeable also that after the publishers had discovered their mistake they made no retraction in the subsequent issues of their paper. In such a state of the proofs the question of good faith in a proper case would be one for the jury.

It was further insisted that the trial court erred in its refusal to permit Mr. Benton, one of the plaintiffs in error, to answer the following question, "If you had found Kappel and Cable to be the same person, would you have published it?" for the reason that the answer might tend to establish an entire absence of malice. It may be explained that the evidence showed that Officer Kappel had in former years passed by the name of Cable, but that learning from a relative that his correct name was Kappel, he had adopted the latter name for about two years preceding the publication complained of. It further appeared that the plaintiff in error Benton knew the prosecutor by the name of Cable, and that he supposed the officer mentioned as Kappel was a new officer, hence the question as above propounded.

But, as we have already observed, the publication in question was not a privileged one, and hence the question asked could not have revealed anything material to the issue, and was properly overruled. There were other errors assigned which were not insisted upon in the argument, and as I find nothing in them that could have been prejudicial to the plaintiffs in error upon their trial, my conclusion is that the judgment below should be affirmed.

*For affirmance*—THE CHANCELLOR, DEPUE, DIXON, GARRISON, GUMMERE, LIPPINCOTT, VAN SYCKEL, BARKALOW, BOGERT, DAYTON, HENDRICKSON, KRUEGER, NIXON.   13.

*For reversal*—None.