FRANK A. LEERS, PLAINTIFF-APPELLANT, v. BENJAMIN GREEN, FRANK J. CUCCIO, JOHN E. ENGEL, GEORGE R. HOLLENBECK, WALTER J. OCHSNER AND FRED W. PFISTER, THE HUDSON DISPATCH, AND THE EVENING NEWS PUBLISHING COMPANY AND WILLIAM J. KOHM, DEFENDANTS-RESPONDENTS.

Argued February 25 and March 4, 1957—Decided May 6, 1957.

*Mr. Harry Green* argued the cause for the appellant.

*Mr. Charles L. Bertini* argued the cause for the defendants-respondents Benjamin Green, Frank J. Cuccio, George R. Hollenbeck, Walter J. Ochsner and Fred W. Pfister (*Mr. Albert S. Gross,* attorney for Benjamin Green).

*Mr. William Rowe* argued the cause for the defendants-respondents The Evening News Publishing Company and William J. Kohm (*Messrs. Steelman, Lafferty & Rowe,* attorneys).

*Mr. James A. Major* argued the cause for the defendant-respondent Hudson Dispatch (*Mr. John J. Breslin, Jr.,* of counsel; *Messrs. Breslin and Breslin,* attorneys).

The opinion of the court was delivered by

HEHER, J. The action is for libel; and the case is here by our certification of plaintiff's appeal to the Appellate Division of the Superior Court from a summary judgment for all defendants.

The complaint, in three counts, charges that on September 17, 1954 the individual defendants, Green, Cuccio, Engel, Hollenbeck, Ochsner and Pfister, "composed, wrote, published and distributed to newspaper reporters and others in the City of Hackensack," New Jersey, certain "false, malicious and defamatory matter," therein specified, "of and concerning the plaintiff, and of him in his office as a member" of the Board of Freeholders of the County of Bergen "and Director thereof, and of his conduct in said offices, in his business and individually," and the defendant Hudson Dispatch, the corporate publisher of the *Hudson Dispatch,* a daily morning newspaper of wide circulation in the City of Union City and in the counties of Hudson and Bergen and surrounding areas in New Jersey, and the defendant The Evening News Publishing Company, the corporate publisher of the *Newark Evening News,* a daily evening newspaper of wide circulation in the counties of Essex, Bergen and Hudson and elsewhere in New Jersey, published in their respective newspapers on the given date certain of the alleged "false,

malicious and defamatory matter," therein also set forth at length, "of and concerning the plaintiff, individually, as a businessman and as a freeholder and director" of the board, each corporate publisher knowing that the "words" so uttered "were not true, and the falsity thereof could have been ascertained by reasonable inquiry or care," all to the damage of plaintiff "in his good name, fame and credit, and position." Kohm was made a defendant as the "special correspondent" of the *Newark Evening News* who "wrote" the published news article.

The demand in each of the several counts was for "compensatory damages" in a given sum.

The alleged defamatory writing consisted of a "news release" by the "Democratic Campaign Headquarters" at Hackensack, New Jersey, "Ben Green, County Chairman," declaring that the "Democratic candidates for Freeholder of Bergen County charge that *a corporation headed by Freeholder Director Frank A. Leers* [the plaintiff] *made a 500% profit on 27 acres of land* in Rochelle Park acquired by the County Park Commission"; and that "In a joint statement released at a special press conference called today, the candidates revealed that the *corporation headed by Leers realized a profit of about $10,000 for approximately 27 acres in Rochelle Park,*" and "asserted that the *Saddle-Rochelle Corporation, incorporated by Frank A. Leers,* his father William R. Leers and his mother Emma E. Leers, *originally purchased the tract of undeveloped land from Rochelle Park for approximately $2000,*" and plaintiff "sat as a director of the all-Republican Board of Freeholders when that body approved condemnation proceedings which resulted in the *windfall profit* to his corporation."

"To substantiate their charge," it was therein affirmed, "the Democratic candidates released the following chronology of the acquisition and condemnation of the land by the Leers corporation: On November 24, 1947 the land was acquired through the purchase of a tax lien from the township of Rochelle Park by the Knickerbocker Knolls, Inc., a corporation composed of Frank Leers and his family; on January

12, 1949, Knickerbocker Knolls, Inc. acquired title by fore-closure of tax lien; incorporators of Knickerbocker Knolls, Inc. were listed as Frank A. Leers, William R. Leers, and Emma E. Leers; this corporation was formed November 13, 1946; on January 29, 1949 Knickerbocker Knolls, Inc. sold this land to the Saddle-Rochelle Corporation, incorporators also consisting of Frank A. Leers, William R. Leers, and Emma E. Leers; this land was condemned by the Bergen County Park Commission with the approval of the County Board of Freeholders and was acquired by the Park Commission on October 16, 1953; the Saddle-Rochelle Corporation headed by Freeholder Director Leers was awarded the sum of $12,400; *this represented,*" it was also said, *"an approximate profit of $10,000 on this single piece of property."*

The released statement then continued:

*"These are the shocking facts unearthed in an investigation of the acquisition of only one piece of property in Bergen County's multi-million dollar park commission.*

Here we have a picture of a family corporation of the selected leader of the all-Republican Board of Freeholders and one time chairman of the Park Committee *profiting by an action by the Board he directed.*

*Can Mr. Leers explain how he can condone a profit to his corporation through an action taken by him while a servant of the County of Bergen?*

*Adding to the inconsistency of Leers' action,* the people of Bergen ought to be reminded that *less than a month before Leers and his corporation acquired this property* (discussing the acquisition of property by the then newly initiated. county park system) he was quoted on October 22, 1946 in the public press as follows:

'It is important,' said Leers, 'that such land be set aside and controlled by the park commission,   *   *   *.'

'Such acquisition should not be too difficult or too expensive. * * *'

'Much of the property privately owned, I feel, can be acquired by gift from individuals.' "

The italics designate the words of the release now characterized as "false" and defamatory.

The newspaper publishers (and the defendant Kohm as the writer of the article in the *Newark Evening News*), it is said in argument, "published substantially said statement and added matters and headlines thereto." The report in

the *Hudson Dispatch* was headlined: "Charge $10,000 made in sale of park land," with these subheads, "Cite 500 P.C. gain" and "Rochelle Park Parcel Under Fire—Bought by Official in '47." And in the *Newark Evening News* the heading was, "500% Deal Profit Charged to Leers," "By William J. Kohm, Staff Correspondent."

But the news article in the *Hudson Dispatch* did not include or refer to the "picture of a family corporation of the selected leader of the all-Republican Board of Freeholders and one time chairman of the Park Committee profiting by an action of the Board he directed"; and the italicized words "* * * Saddle-Rochelle Corporation, incorporated by Frank A. Leers * * * originally purchased the tract of undeveloped land from Rochelle Park for approximately $2,000" and "Adding to the inconsistency of Leers' action * * *" were not in either newspaper narrative.

The individual defendants (cited as the authors and distributors of the news release) answered denying the article was in content false, malicious and defamatory, and pleading, by way of separate defenses, (1) the truth of the statements, in a circumstantial account of the proceedings and plaintiff's participation in the transaction; (2) their utterance as "a fair comment upon the conduct of the plaintiff in his official capacity," for the information of the "general public," and "privileged" as "a matter of legitimate public interest in accordance with the political practices of our State and Nation"; (3) the complaint does "not set forth a cause of action," nor does it declare "which part of [the] publication was untrue and which parts were true"; and (4) plaintiff has not suffered damage. Defendants reserved "the right" at or before trial to move to strike the complaint "on the grounds set forth in [the] answer."

The newspaper publishers and Kohm pleaded the truth of their respective publications, in an equally circumstantial account of the transaction at issue, and also, by separate defenses, that the published article concerned "acts affecting the plaintiff as a public official in his official capacity," and as to "items of fact" it is "true in substance," and otherwise

constitutes "fair comment upon the conduct of the plaintiff in his * * * official capacity," and so the article "was published as a matter of legitimate public interest within the proper function of the defendant(s) as reporter and publisher of a newspaper." And the corporate publisher of the *Newark Evening News* and Kohm also pleaded, as separate defenses: (1) the complaint does not disclose a cause of action; (2) the "release was presented to and discussed with plaintiff prior to publication by these defendants" and the "publication sets forth a fair and accurate report of the statement then and there made in response to [the] release," and the "entire article does not purport to express the defamatory meaning or meanings attributed to these defendants' publication by the complaint." The publisher of the *Hudson Dispatch* also pleaded, as a separate defense, that its publication conformed to the news release, and that the release "was based upon statements made by the plaintiff himself, which * * * he expressly or by implication authorized to be published." And both publishers pleaded, as a separate defense, that in the event of an assessment of damages, the publication of the release in other newspapers and media of communication in Bergen County should be considered in mitigation of damages.

## I.

February 27, 1956 there was a pretrial stipulation of these matters of fact, among others: At the time of the publication in question, and before and since, plaintiff was engaged "in the real estate business, * * * buying and selling real estate, and in the development and improvement of real property"; September 17, 1954, and before and since, he was also "a Republican member" of the Bergen County Board of Freeholders; he was first elected to that body in 1943, and was in continuous service until January 2, 1956, when his final term ended, and was director of the board continuously from November 1943 until his tenure as a member came to a close; he was "not a candidate for public office"

at the 1954 general election; at the 1946 general election the electorate approved a referendum proposal for the establishment of a county park system; plaintiff publicly advocated approval of the project, and "in the course of his public addresses, he said that he felt some property could be acquired for the public parks by gift from public spirited citizens"; the park commission was organized in January 1947; plaintiff served as chairman of the park committee of the board of freeholders from January 2, 1946 until January 2, 1949, and again as a member of the committee "during 1950–1951"; Knickerbocker Knolls, Inc. was a family corporation; plaintiff held 10 of the 20 issued shares, and his father and mother each held 5 shares; November 24, 1947 Knickerbocker acquired title to three tax-sale certificates for lands in Rochelle Park, one for $1,200, the second for $14,000, and the third for $800, comprising three contiguous lots in total area between 73 and 81 acres; Knickerbocker foreclosed and acquired title to all three lots January 12, 1949; another family corporation was then organized, Saddle-Rochelle Corporation—again, plaintiff and his parents were the shareholders and directors—and Knockerbocker conveyed the three lots to the new corporation January 29, 1949; June 14, 1949 Saddle-Rochelle sold and conveyed 44.265 acres of the whole to Godfrey Estates, Inc. for $57,544.50; March 2, 1953 the park commission adopted a resolution "to condemn" 28.86 acres of the remainder of the tract, and two days later the board of freeholders by resolution authorized the park commission to "acquire" the lands "by condemnation proceedings"; plaintiff "presided at the meeting [of the freeholders] at which said resolution was adopted, but voted against the resolution"; the commissioners in condemnation made an award of $12,400 for the given acreage, and January 6, 1954 the freeholders adopted a resolution "approving the award of $12,400 and authorizing payment"; plaintiff "presided at the meeting of the Board * * * at which [the] resolution was adopted, but * * * voted against the adoption of [the] resolution"; and payment to Saddle-Rochelle was made

accordingly. Plaintiff disclaimed all "special or punitive damages."

The defendants Cuccio, Engel, Hollenbeck, Ochsner, and Pfister were freeholder candidates of the Democratic Party, and the defendant Green was their campaign manager.

Thereupon, April 9, 1956, plaintiff gave notice to all parties of a motion to strike out all separate defenses thus interposed as insufficient in fact and in law "to justify the publication of the news release" and "to constitute the truth of the charge made," and insufficient in law as "fair comment and privileged communication," and for a hearing and determination under *R. R.* 4:12–4 of the individual defendants' reserved motion to strike out the complaint and of the joint defense of the publisher of the *Newark Evening News* and Kohm that the complaint as to them does not declare a cause of action, and "judgment interlocutory for liability" against all defendants upon the grounds that they "have failed to justify the truth of the news release published by [them], and alleged fair comment and privilege thereof [but failed] to plead same fully and as to every particular in the answer filed by [them]."

And defendants were advised in the notice that plaintiff would "rely upon the pleadings * * *, depositions and pretrial order" referred to *supra*.

Upon the argument of the motion, Judge Waesche made these findings of fact, grounded in the pretrial concessions: The "total purchase price" of the three tax title certificates was $16,000; 44.265 acres were sold to Saddle-Rochelle for $57,544; and, including the cost of foreclosure, Saddle-Rochelle "received in excess of $38,000 more for only that portion of the property sold to Godfrey Estates than the entire parcel cost," and "there was left the 28.86 acres," later conveyed to the county, and some additional land. Reference was made to the charge that "a profit was realized from that 27 acres taken by the County of 500 per cent, or $10,000," and to defendants' contention that the assessed value of the portion of the land conveyed to the county "was approximately 13.43 per cent of the previously assessed value

of the entire tract," and that "13.43 per cent of $16,000 is approximately $2,100"; and he said that "if that is a fair apportionment for that portion of the property taken by the County, then the County paid approximately $10,000 more than the land sold for at the sale of the tax certificates," and thus "the defense of justification is good"; but "if there is doubt as to the language used or the meaning attributable thereto, * * * then it is a question of fact for the jury to determine," and whether the question is for the court or the jury "will depend upon the evidence as it is adduced at the trial."

The motion to strike out the defense of truth was denied. Whether the asserted profit of 500% of $10,000 was "comment" or a statement of fact and, if the former, whether it was essentially fair, could well depend, the judge thought, on the evidence to be adduced at the trial, and he refused to strike out the defense of fair comment.

Thereupon, plaintiff's attorney made demand for an immediate disposition of defendants' reserved motion to dismiss the complaint as deficient in the statement of a cause of action. Counsel said: "* * * if the complaint sets forth no cause of action, it may save a lot of time, effort and expense if Your Honor determines that now, instead of going through a long protracted trial."

The judge demurred, inquiring if it were not "unusual for the plaintiff to ask the Court to decide whether or not his complaint sets forth a cause of action." Counsel persisted, saying "I do it on every case. * * * *Rule* 4:12–4 so provides that I make the application." When the judge remarked that the rule refers to defenses, counsel replied: "This is a defense. They raise the reservation by way of defense that my complaint does not set forth a cause of action on which relief can be granted." After some deliberation, the judge entertained the motion. And he concluded that the challenged statement "criticizes the plaintiff * * * for realizing a profit on this transaction which is the result of a program which, as a member of the Board of Freeholders, he advocated," but this would not constitute "a

criminal offense" in violation of *N. J. S.* 2*A*:135–8; that "the criticism of his act as a public official is one that would be considered within the limits of the law as reasonable"; that "there was nothing improper in his realization of a profit, even though the profit be substantial," and the statement is not libelous *per se* and, since there is no claim of special damages, the complaint does not set forth a good cause of action; that the statement "was issued during the campaign for the general election of November 1954," and the "criticism comes within the meaning of fair comment, and for that reason the complaint does not set forth a good cause of action," and so it was dismissed as to all defendants.

Again at the instance of plaintiff's counsel, the court considered the motion to strike out the defenses; and the motion was overruled as to the defenses of truth and fair comment, and sustained as to the others.

Then plaintiff's counsel asked for a "formal ruling" on his motion for an interlocutory judgment "for liability against the defendants," for failure to "justify the truth of the news releases" and to plead "fair comment and privilege * * * fully and as to every particular"; and the motion was denied.

There was judgment final for the defendants accordingly, including a finding that the "allegations of the complaint and answers and the admissions of the pretrial order" disclose "no genuine issue as to any material fact," and a recital that the complaint had been "dismissed as to each count," and the court had "treated the motion herein under the rules of Court as for summary judgment."

## II.

The contention is that it was (a) error to hold that the publications "were not libelous *per se*" and "were not actionable otherwise without special damages being pleaded or claimed," and to dismiss the action on that ground; and (b) error also to deny plaintiff's motion for judgment of

liability against all defendants for failure "to justify the truth of the publications by them and fair comment, in the answers made by them, or otherwise."

No man may disparage the reputation of another, that is to say, the esteem in which he is held. Every man has a right to his good name, unimpaired; and false defamatory words, written and published, injurious to the reputation of another or exposing him to hatred, contempt or ridicule or subjecting him to a loss of the good will and confidence entertained towards him by others, constitutes a libel, actionable *per se* without proof of any consequential special damage where the imputation of the words on their face is such as to raise the presumption of damage in the natural course, as a matter of law. Injury to reputation may be either (1) presumed from the nature of the words themselves, or (2) proved by evidence of their consequences. *Johnson v. Shields,* 25 *N. J. L.* 116 *(Sup. Ct.* 1855); *Hand v. Winton,* 38 *N. J. L.* 122 *(Sup. Ct.* 1875); *Benton v. State,* 59 *N. J. L.* 551 *(E. & A.* 1896); *State v. O'Hagan,* 73 *N. J. L.* 209 *(Sup. Ct.* 1906); *Garven v. Finch,* 97 *N. J. L.* 329 *(E. & A.* 1922); *Wilson v. Savino,* 10 *N. J.* 11 (1952); *Rogers v. Courier Post Co.,* 2 *N. J.* 393 (1949); *Earl v. Winne,* 14 *N. J.* 119 (1953); *Brogan v. Passaic Daily News,* 22 *N. J.* 139 (1956). See *Odgers, Libel and Slander* (6th ed. 1929), 1 *et seq.; Gatley, Libel and Slander* (4th ed. 1953), 1, 15 *et seq.* And the principle applies to any media for conveying defamatory thought and ideas. *Spencer Bower's Actionable Defamation* (2d ed.), 226. "The law recognizes in every man a right to have the estimation in which he stands in the opinion of others unaffected by false statements to his discredit." *Scott v. Sampson,* [1882] 8 *Q. B. D.* 491, 503, Cave J. See *Newell, Slander and Libel* (4th ed.), secs. 1, 2 *et seq.*

"Fact" and "comment" are not always readily distinguishable. The distinction between an allegation of fact and expression of opinion, *Odgers, Libel and Slander, supra,* 166, "often depends on what is stated in the rest of the article. If the defendant accurately states what some public

man has really done, and then asserts that 'such conduct is disgraceful,' this is merely the expression of his opinion, his comment on the plaintiff's conduct. So, if without setting it out he identifies the conduct on which he comments by a clear reference. In either case, the defendant enables his readers to judge for themselves how far his opinion is well founded; and, therefore, what would otherwise have been an allegation of fact becomes merely a comment. But if he asserts that the plaintiff has been guilty of disgraceful conduct, and does not state what that conduct was, this is an allegation of fact for which there is no defence but privilege or truth. The same considerations apply where a defendant has drawn from certain facts an inference derogatory to the plaintiff. If he states the bare inference without the facts on which it is based, such inference will be treated as an allegation of fact. But if he sets out the facts correctly, and then gives his inference, stating it as his inference from those facts, such inference will, as a rule, be deemed a comment. But even in this case the writer must be careful to state the inference as an inference, and not to assert it as a new and independent fact; otherwise, his inference will become something more than a comment, and he may be driven to justify it as an allegation of fact."

Apropos of plaintiff's contention that the defense of fair comment was not pleaded "fully and as to every particular," the House of Lords recently held that the question in all cases is whether "there is a sufficient *substratum* of fact stated or indicated in the words which are the subject-matter of the action, * * *." *Kemsley v. Foot,* [1952] *A. C.* 345. There, the point made was that "no, or no sufficient, statement of the facts on which the comment is made appears in the [newspaper] article complained of"; and Lord Porter said that the facts necessary to justify comment might be implied from the terms of the impugned article, and the relevant questions were whether (a) the subject matter was indicated with sufficient clarity to justify comment being made, and (b) the comment actually made was such as an honest, though prejudiced, man might make.

The article there at issue concerned "what has been described as 'the Beaverbrook Press' and which is violently critical of Lord Beaverbrook's newspapers"; and the words "Lower than Kemsley" were interpreted as alleging that "the conduct of the Kemsley Press was similar to but not quite so bad as that of the press controlled by Lord Beaverbrook, *i. e.,* it is possibly dishonest, but in any case low"; and the holding was that "it is at least arguable that the words directly complained of imply as fact that Lord Kemsley is in control of a number of known newspapers and that the conduct of those newspapers is in question." The contention that "* * * all the facts justifying the comment must appear in the article * * *" was rejected.

Lord Oaksey observed that it is not "a statement of fact that a newspaper is low: it is a comment"; and a defendant who has made a defamatory comment on a matter of public importance must be free to adduce any relevant evidence tending to show that the comment was fair.

And where the words are ambiguous, reasonably capable of either an innocent or a defamatory meaning, it is a question of fact for the jury to determine in which of the two meanings they were understood by those to whom the publication was made. The court determines whether a communication is capable of a defamatory meaning; the jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient. *Restatement, Torts, section* 614.

It is a good defense to an action of libel or slander that the words in question are fair comment on a matter of public interest or concern. "[F]air comment is not libelous at all and requires no justification." *Schwarz Bros. Co. v. Evening News Publishing Co.,* 84 *N. J. L.* 486 (*Sup. Ct.* 1913). "[F]air and bona fide comment and criticism upon matters of public concern is not libel, and * * * the words are not defamatory." *Merrey v. Guardian Publishing Co.,* 79 *N. J. L.* 177, 184 (*Sup. Ct.* 1909), affirmed 81 *N. J. L.* 632 (*E. & A.* 1911). See *King v. Patterson,* 49 *N. J. L.* 417 (*E. & A.* 1887). "It is one thing to

comment upon or criticise, even with severity, the acknowledged or proved acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct." *Davis v. Shepstone, L. R.* 11 *App. Cas.* 187 (1886). "[The article] is no libel if it is within the range of fair criticism; otherwise, it is." *Campbell v. Spottiswoode,* [1863] 32 *L. J. Q. B.,* 185, 201, Crompton, J.

In England, whence comes our common-law jurisprudence, the press and the public have the same right of fair comment.

"The freedom of the journalist in an ordinary part of the freedom of the subject, and to whatever length the subject in general may go, so also may the journalist, but, apart from statute law, his privilege is no other and no higher. * * * [T]he range of his assertions, his criticisms, or his comments is as wide as, and no wider than, that of any other subject. No privilege attaches to his position." *Arnold v. King-Emperor,* (1914) 83 *L. J. P. C.* 299, Lord Shaw.

Such is the general rule in this country. *Schwarz Bros. Co. v. Evening News Publishing Co., supra; Haynes v. Clinton Printing Co.,* 169 *Mass.* 512 (*Sup. Jud. Ct.* 1897), Holmes, J.

In this we have the very essence of the freedom of speech and of press secured by the 1947 State Constitution, *Article I, paragraph* 6, holding the actor "responsible for the abuse of that right," (derived from the 1844 Constitution, *Article I, paragraph* 5) and also by the First Amendment to the Federal Constitution.

In England, too, the "right of fair comment is one of the fundamental rights of free speech and writing which are so dear to the British nation, and it is of vital importance to the rule of law on which we depend for our personal freedom." *Lyon v. Daily Telegraph,* [1943] 1 *K. B.* 746, 753, Scott, L. J.

In a word, "fair comment" (a) must be based on facts truly stated, and (b) must not contain imputations of corrupt or dishonourable motives on the person whose conduct or work is criticised, save in so far as such imputations are warranted by the facts, and (c) must be the honest expression of the writer's real opinion; and if the

comment complies with these conditions, it is fair comment, however incorrect be the views expressed by the critic, or however exaggerated or even prejudiced be the language of the criticism; the "limits of criticism are exceedingly wide." *Gatley, Libel and Slander, sections* 344, 354. But criticism "cannot be used as a cloak for mere invective, nor for personal imputations not arising out of the subject-matter or not based on fact"; "invective is not criticism." *McQuire v. Western Morning News,* [1903] 2 *K. B.* 100, 108, Collins, M. R. See, also, *Dressler v. Mayer,* 22 *N. J. Super.* 129 (*App. Div.* 1952), Eastwood, J. A. D.

And, as has been said, it is for the judge to decide whether a communication is capable of a defamatory meaning and also, it may now be added, whether the matter commented on is one of public concern; and while it is for the jury to decide, under appropriate instructions, whether the words are allegations of fact or expressions of opinion, and, if expression of opinion, whether such expressions of opinion are fair comment or not, in every case it is first of all the duty of the judge to determine whether there is any evidence of unfairness to go to the jury. *Sutherland v. Stopes,* [1925] *A. C.* 47. "No doubt in most cases of this class there are expressions in the impugned document capable of being interpreted as falling outside the limit of honest criticism, and, therefore, it is proper to leave the question to the jury, and in all cases where there may be a doubt it may be convenient to take the opinion of a jury. But it is always for the judge to say whether the document is capable in law of being a libel." *McQuire v. Western Morning News,* cited *supra.* If the judge finds there is no evidence that the alleged libel exceeds the bounds of fair comment, he should stop the case and enter judgment for the defendant. *Henwood v. Harrison,* (1872) *L. R. 7 C. P.* 628. If there be "no evidence on which a rational verdict for the plaintiff can be founded," the defendants are entitled to judgment. *McQuire v. Western Morning News,* cited *supra.* See also, 53 *C. J. S. Libel and Slander* § 229.

These are basic principles in the judicial process that have the sanction of long experience and general acceptance. The provision of the 1947 State Constitution, *Article* I, *paragraph* 6, that "* * * the jury shall have the right to determine the law and the fact" does not have a different connotation, if it be deemed to include civil actions. Such constitutional and statutory provisions are generally read as enabling the jury "to render general verdicts as in other cases, instead of special verdicts, as was formerly the rule." 26 *A. L. R.* 863. See 33 *Am. Jur., Libel and Slander,* § 292. Certainly, it was not designed by this constitutional precept to deprive the court of the power in essence judicial to terminate the proceeding where in any reasonable view of the evidence the charge of libel has not been sustained. See *Jacobs v. Transcontinental & Western Air, Inc.,* 358 *Mo.* 674, 216 *S. W. 2d* 523, 6 *A. L. R. 2d* 1002 (*Sup. Ct.* 1948). Although the particular provision was a part of the 1844 Constitution, *Article* I, *paragraph* 5, we are aware of no case in New Jersey holding otherwise; the traditional distinction in the functions of the court and jury has had full recognition in the particular field. See *Wilson v. Savino, supra; Dressler v. Mayer, supra.* Indeed, the plaintiff here complains that the issue of liability was not taken from the jury.

By the motion for an interlocutory judgment of liability against all defendants, plaintiff submitted to the court for determination the basic question of legal responsibility as a matter of law devoid of a genuine issue of fact. The contention was that the issue was one of law for the court. The motion in this regard, as has been said, was not merely to strike out the separate defenses as insufficient in law, but also for judgment final on the merits for want of proof "to justify the truth of the news releases" and failure to plead fair comment "fully and as to every particular," relying to that end on the "pleadings, depositions and pretrial order," and thus a motion for summary judgment under *R. R.* 4:12–3, providing that if, on a motion for judgment on the pleadings, "matters outside the pleadings

are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in *Rule* 4:58, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by *Rule* 4:58." This latter rule provides, *R. R.* 4:58–3, for an immediate judgment "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law"; or, in the event there cannot be judgment on the whole case, *R. R.* 4:58–4, for a determination of "what material facts exist without substantial controversy" and the material facts "actually and in good faith controverted."

█ The judge proceeded accordingly and held as a matter of law that there was neither misrepresentation of fact nor unfair comment, nor was there evidence of unfairness to go to the jury; and we concur in these findings and the consequent judgment for defendants on the merits.

There was no substantial misstatement of the gain or the percentage of gain when the transaction is assayed as a whole. Counsel sought to limit plaintiff's pretrial examination to the 27 acres acquired by the county, and thus to exclude evidence bearing on the crucial issue of the *quantum* of gain in relation to the content of the article, and was properly overruled. There was no material factual deviation from the truth; and there was no unfairness in the comment made, no basis whatever for the inference that the comment was other than the respective defendants' honest opinion on a matter of undoubted public concern.

The gain was in substance as stated in the article. There is no contention, much less proof, that the land thus taken by the county had a greater *pro rata* value than the land sold to Godfrey Estates, Inc. Plaintiff "headed" the family corporation that realized the profit. The land "was condemned" by the park commission "with the approval of the Board of Freeholders" at a time when plaintiff "sat" as director of the board. The "chronology" is not at fault.

Plaintiff was reminded that he had publicly advocated the establishment of a county park system, and had suggested that the acquisition of land for the purpose "should not be too difficult or too expensive" and "Much of the property privately owned, I feel, can be acquired by gift from individuals," and he was asked to "explain how he can condone a profit to his corporation through an action taken by him while a servant of the County of Bergen." His explanation was included in the article published in the *Newark Evening News*: he had "vigorously opposed the acquisition of the land owned by a corporation in which he had an interest, 'not because it was not in the public interest but because of my partial ownership' "; he had "vigorously opposed this acquisition in conference," and had there stated that so long as he was a member of the board "the land would not be sold voluntarily to the county"; and he had "publicly voted against instituting condemnation proceedings to acquire the property."

Plaintiff was a real estate dealer and at the same time a member and director of the board of freeholders, first elected in 1943, and for several years a member and chairman of the board's park committee; the county park commission came into being in January 1947 as the result of a referendum; and not long thereafter, November 24, 1947, he arranged for the purchase of the certificates of title to the lands in question, titles later perfected in the family corporation by foreclosure; and he was at all times the executive director of the corporation.

Plaintiff did more than refrain from participation in the proceedings of the board of freeholders as for conflict of interest; he voiced opposition, he insisted, to the proposal to acquire the lands within his control for park purposes, although the general project had elicited his ardent public approval, and he voted against the resolutions of the board to acquire the lands and to appropriate moneys for the payment of the purchase price, "not because it was not in the public interest but because of [his] partial ownership." But he was less vocal in public on the reasons for his action.

Much is made of the reference in the article to the "picture of a family corporation of the selected leader of the all-Republican Board of Freeholders and one time chairman of the Park Committee profiting *by an action by the Board he directed.*" (Italics supplied) It is said that the "clear meaning" of the words "he directed" is that plaintiff "ordered the members of the Board to do it," indicating "affirmative action whereas  *  *  *  he opposed it and voted in the negative."

But the antecedent of "directed" is plainly the word "Board," not "action." The phrase has reference to plaintiff's office as director of the board of freeholders. Such is the clear and obvious meaning of the words, taken and compared together. Neither sense nor syntax would sanction the offered connotation. The expression "action taken by him" in the succeeding sentence does not, standing alone or in context, mean that plaintiff "ordered" the board to proceed as it did.

The natural signification of the words has not been enlarged by an innuendo to include the wider defamatory sense. See *Hand v. Winton,* 38 *N. J. L.* 122 (*Sup. Ct.* 1875); *Curley v. Feeney,* 62 *N. J. L.* 70 (*Sup. Ct.* 1898). The words do not necessarily impute the commission of crime under *N. J. S.* 2*A* :135–8. But we have no occasion now to determine that question.

The transaction is one of public concern, indisputably so, involving as it does the people's "right to know" of matters related to the common interest; and the circumstances were made known in terms conforming to factual truth and by comment in no wise offensive to the standard of fairness which maintains the balance between basic individual right to protection of good name and fame and the freedom of speech and of press basic to constitutional liberty. It was fair comment on facts truly stated; and so the publication is not libelous in law. Where the subject matter thus concerns the general welfare, it follows that however the conduct be assessed, as to criminal responsibility or legal or ethical propriety, the question is whether the impugned statements

are true in fact and the comment made has the essential quality of fairness, an attribute that is not necessarily tested by the choice of words or nicety of expression, but rather by the substance of the observations considered in context.

Affirmed.

WEINTRAUB, J. (dissenting). The majority conclude as a matter of law that the statements complained of are not libelous.

Consideration of this case is complicated by the procedural steps below. Plaintiff moved for judgment as to liability, and I agree the trial court properly refused to grant it. Plaintiff's further motion to strike the separate defense which asserted that the complaint failed to state a claim for relief raised only the question of the sufficiency of the complaint on its face.

It is unnecessary for present purposes to differentiate the counts against the several defendants.

The statements which trouble me are these:

"Here we have a picture of a family corporation of the selected leader of the all-Republican Board of Freeholders, and one-time chairman of the Park Committee profiting *by an action by the Board he directed.*

Can Mr. Leers explain how he can condone a profit to his corporation through *an action taken by him while a servant of the County of Bergen?*" (Italics added)

These statements are ambiguous, but each could have been understood to mean that plaintiff participated in an action which resulted in profit to himself, to wit, the decision to select his property for condemnation, and if so understood, would be libelous. As I see the issue before us, we are concerned solely with the sufficiency of the complaint and since I believe the complaint on its face is adequate, I would reverse and remand the matter for further proceedings.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING and JACOBS—5.

*For reversal*—Justice WEINTRAUB—1.