**SCHIAVONE CONSTRUCTION CO. and Ronald A. Schiavone, et al. Plaintiffs,**

v.

**TIME, INCORPORATED, Defendant.**

**Civ. A. No. 83–932.**

United States District Court,
D. New Jersey.

Oct. 1, 1985.

Connell, Foley & Geiser by Peter G. Banta, Newark, N.J., for plaintiffs.

Winne, Banta & Rizzi by Peter G. Banta, Hackensack, N.J., for defendant.

## OPINION

SAROKIN, District Judge.

### INTRODUCTION

Although summary judgment motions by the media in defamation actions are not entitled to any special enhancement, the underlying reasons for allowing such motions are particularly applicable in this type of matter. Summary judgments are designed to avoid the expense and time of trial and permit an early disposition where there are no genuine issues of material fact to be resolved. In every case such savings are a creditable goal, but in a defamation action they go far beyond the direct economies effected. Totally apart from the ultimate verdicts for libel against the media, the mere pendency and continuation of such actions must of necessity have a chilling effect upon the freedom of the press. If the threat of a libel action is causing any segment of the media to hesitate to publish knowingly false or misleading information about persons or companies, then it is serving a worthwhile function. But if it is causing hesitation by the media in those borderline situations in which the public has a right to know, then one of our most important liberties is in peril.

■ Possibly the giants of the industry have both the finances and the stamina to run the risk in such situations. But the independent will of smaller magazines, newspapers, television and radio stations undoubtedly bends with the spectre of a libel action looming. Even if convinced of their ultimate success on the merits, the costs of vindication may be too great for such media defendants to print or publish that which may entail any risk of a court action. If that is the result, it is a sorry state of affairs for the media, and, more important, for this country. Therefore, probably more than any other type of case,

summary judgments in libel actions should be readily available and granted where appropriate. We must accept the fact that while many defamation actions are instituted in good faith with the expectation that they will be tried to conclusion, unless a satisfactory settlement is reached in the interim, many are started for strategic reasons with no real expectation of pursuing a trial on the merits. There is no more dramatic means of denying charges than the institution of a libel action, only to be abandoned later when its purpose has been served. In the meantime, the media in all of its forms is involved in spending its energy, time and money defending such actions. The sheer number and defense costs must take its ultimate toll on a free press. While recognizing the power of the media to destroy a reputation in an instant of television coverage or with a banner headline, we must also recognize the power of libel actions, even their mere threat or pendency, to destroy the press itself and with it the very foundation of our democracy.

Here, even if plaintiffs are successful in establishing liability, as they may well be, it is unlikely that they will be able to prove damages attributable to the particular falsehood alleged in view of the vast publicity given to all facets of the Donovan controversy. Indeed, those parts of the article not alleged to be defamatory are, perhaps, more damaging than that which is the subject of this suit. However, notwithstanding the court's fears regarding the effect of the mere pendency of actions such as these, binding precedent does not permit a summary disposition of the matters here presented in favor of the defendant.

This is a libel action brought by Schiavone Construction Company and Ronald A. Schiavone against Time, Inc., regarding a magazine article published in the "Nation" section of the August 23, 1982 issue of TIME magazine. The article, entitled "Jury Still Out: Donovan probe is reopened," stated that Special Prosecutor Leon Silverman had reopened his investigation of then Secretary of Labor Raymond

Donovan and would be presenting fresh allegations about Donovan's conduct to grand juries in New York and elsewhere. After noting that Phase II of the inquiry would focus on charges that Donovan had met with two known mobsters near Miami in January, 1979, the article discussed the failure of the Special Prosecutor in his first probe to pursue all leads concerning the January, 1979 meeting. The article concluded:

> The FBI faces some tough questioning of its own. The Senate Labor Committee is investigating the bureau's handling of Donovan's confirmation probe 18 months ago. The personal files of FBI Director William Webster, forwarded to the committee last month, reveal that the name of Schiavone appeared several times in the bureau's reports on the 1975 disappearance of former Teamster Boss Jimmy Hoffa. That detail would surely have intrigued both the Senate committee that approved Donovan's nomination in February 1981, and the special prosecutor this year. But neither learned about it until last month.

It is only this last paragraph of the article to which plaintiffs object and which has become the subject of this suit. It is uncontroverted that such paragraph refers to a memorandum in the files of FBI Director William Webster, which memorandum states, in pertinent part, that Mr. Webster advised Presidential Counsellor Edwin Meese "that a company, Chivone (PH), in which he [Donovan] apparently had a very substantial interest, had appeared a number of times in reports in our HOFEX case, but that none of these suggested any criminality or organized crime accusations." Aff. of John F. Neary (6/11/85), Exh. A.

FACTS

In February, 1981, TIME's Chief of Correspondents, Richard Duncan, told Senior Correspondent Alexander McNeil Smith to "[c]over the Donovan case." T220:2–016.[1] An experienced reporter with over forty-

five years of experience in the newspaper business, Smith had been with TIME since 1969. T52:2–22. From 1981 until his deposition on October 29, 1984, Smith accumulated between twenty and thirty files on Donovan. T163:5–8. Approximately twenty stories resulted from these files. T163:9–25.

In June, 1982, T107:6–15, Smith learned from three separate confidential informants of the contents of a confidential memorandum authored by FBI Director William H. Webster to then Executive Assistant Director of the FBI, Francis P. Mullen, dated December 15, 1980. Although Smith never saw the memorandum, it was read to him, T105:22–25; T106:12–25; T107:2–6; T18:5–9, and he wrote down its contents word-for-word in his notes. T91:2–4. The Webster memorandum reported December 12, 1980 conversations between Mr. Webster and Pen James and Edwin Meese, both members of the staff of then President-elect Ronald Reagan. The memorandum read as follows:

> Mr. Edwin Meese called during my absence at 10:15 a.m. 12/12/80, and said he would return the call upon my return. He was tied up with President-elect Reagan and asked Mr. Pen James to return the call. Mr. James asked whether we had reached any conclusion as a result of our inquiry into Pat Donovan. I checked with Mr. Revell and based on information which he supplied, as well as my recollection of conversation with Mr. Mullen while I was in New York on December 10th, that we had reviewed all our indices and had checked with all field offices and nothing negative had been disclosed. I advised that a company, Chivone (PH), in which he apparently had a very substantial interest, had appeared a number of times in reports in our HOFEX case, but that none of these suggested any criminality or organized crime associations. I further advised that it did not appear necessary, in our view, to conduct a full

---

1. "T" refers to the transcript of Alexander Smith's deposition, taken on October 29 and

November 12, 1984.

field investigation based on the results of the name check. Mr. James said that he might need our assistance in the course of the confirmation proceedings and I, of course, stated that we would do whatever we could to help.

I advised that the report had been sent to Miss Jane Donower (PH), Mr. Fielding's secretary. Mr. Fielding was present with Mr. James at the time of our conversation, and was not aware that the report had been delivered.

William H. Webster

Director

Mr. Meese called at 4:40 p.m., 12/12/80, and wanted to be certain that there were no ongoing investigations involving Donovan. I confirmed to him, based on what I had been previously advised, that this was the case. We will certainly be asked for a full field following the nomination, but I told him that I knew of nothing to hold up the nomination at this time.

After hearing the contents of this memorandum, Smith understood that the FBI had concluded that the Schiavone references in the HOFEX files "did not suggest any criminality." T360:10–14. However, Smith felt that "everything Webster said in the memorandum was totally contradicted by the information that [Smith] had received from confidential sources." T9:2–4. Thus, while Mr. Webster stated that the FBI had reviewed all indices and checked all field offices and that nothing negative had been found, Smith's sources told him that the field offices had not been checked. T23:22–24. And while Mr. Webster had written that the FBI concluded "that none of these [HOFEX references] suggested any criminality or organized crime associations," Smith found such conclusion to be contradicted by other information which he had been told was in the FBI files. First, Smith was told by his confidential sources that a six-month wiretap in 1979 of William P. Masselli, undertaken as part of the FBI Tuminaro Conspiracy ("TUMCON") investigation, regarding organized crime activity and the alleged use of political influence to

obtain construction contracts, *see* Aff. of Peter G. Banta (5/14/85), Exh. B, at 6, made reference to Schiavone Construction Co. and Donovan. According to these sources, Masselli described himself on the wire as a member of the Genovese crime family. The wiretap disclosed that Masselli had obtained a Schiavone contract from a "gangster" and that a Mafia "sit-down" had sanctioned Masselli's takeover of such contract. Further, Smith was told that the wiretap showed that Masselli used his influence with corrupt union officials for the benefit of the Schiavone Company and that Masselli received money any time he wanted it from the Schiavone company. T19:9–21:12. Smith stated, "Any association with Masselli would be a suggestion of organized crime associations." T20:16–17.

Second, Smith's confidential sources told him of the reports of Michael Orlando, an FBI informant. Orlando had reported to the Bureau that Masselli described Secretary Donovan as his "ace in the hole," and that a Genovese gangster named Albert Facchiano had demanded no-show jobs on a Schiavone construction project. Orlando stated that a conference was held in Miami regarding the no-show jobs and that Donovan participated in such conference as well as in follow-up meetings with Masselli and Schiavone in order to implement the decisions reached at the Miami conference. T21:13–22:9. Smith concluded, "All of that to me suggested criminality and organized crime references." T22:9–10.

In addition to the TUMCON wiretaps and the Orlando reports, Smith had been told that the FBI files contained information concerning three grand jury investigations "in which the Schiavone Company was the subject," which he referred to as the Kantor case, the Gross case and an investigation of Masselli's minority-owned business. T23:6–13. Finally, in June 1982, Smith had obtained a confidential FBI memorandum dated January 12, 1981 from C.P. Monroe to Francis Mullen concerning the Donovan inquiry, and advising that Donovan had possible affiliations with LaCosa Nostra

("LCN"). In part, such memorandum states:

Two independent sources of the New York Division have advised that the Schiavone Construction Company, in which Mr. Donovan is an Executive Vice President, is "mobbed up." One source indicates the upper management of the Schiavone Construction Company is closely aligned with the Vito Genovese Family of the LCN through Schiavone Vice President Albert Magrini and its contacts with Jopel Construction headed by William Masselli who is an alleged self-admitted "soldier" in the Genovese family. This New York source alleges Mr. Donovan is acquainted with LCN members through Magrini and Masselli on a business and social basis and has in fact traveled from New York to Miami for the 1979 Super Bowl with Masselli and other LCN figures in the construction business.

\* \* \* \* \* \*

None of the New York sources was able to provide any information that shows any specific criminal misconduct on the part of Mr. Donovan.

A search of the central files of the FBI, the indices of the New York Office, and the Organized Crime Information System disclosed one pertinent reference to Mr. Donovan which is a Title III overhear between William Masselli and his son Nat Masselli, which makes reference to the fact that Mr. Masselli was going to pick up Ronnie Schiavone and Raymond J. Donovan and take them to a social function.

Neary Aff., Exh. B.

Thus, when Mr. Webster's memorandum was read to Smith in June 1982, the only material in the memorandum that, in Smith's view, was not contradicted by other information he knew to be in the Bureau's possession was Mr. Webster's statement that the Schiavone Company had appeared a number of times in reports in the HOFEX case. T361:25–362:4. Smith attempted to verify the accuracy of the Webster memorandum, T58:10–13, but was told by three confidential sources that the Schiavone references in the HOFEX file were "missing," T798:22–25; T80:2–3; T119:14–20; T122:18–21, that "they could not be found," T358:21–23, and that "nobody could find it." T122:19–23. He then attempted independently to verify the accuracy of the memorandum by investigating the affairs of Salvatore Briguglio, T59:16–24; T120:16–17, and by looking into the "Canny wiretapping." T120:15–22; T59:16–24. Neither investigation produced support for or verification of the Webster memorandum. T63:10–15; T358:14–28.

On July 21, 1982, Smith met with Special Prosecutor Leon Silverman, who had been appointed in December 1981 to investigate additional allegations of criminal wrongdoing by Donovan.[2] Also present was Assistant Special Prosecutor Gregory N. Joseph. Smith told Silverman that "the FBI has acknowledged that ... the name of the Schiavone company came up in the Hoffex case." Neary Aff., Exh. C, at 21. Silverman responded, essentially, that "nothing that came to our attention linked any of the principals of Schiavone with the Hoffa case." *Ibid.* Smith states that when he left the meeting, he was told that Silverman would make some attempt to find, and determine the nature of the HOFEX references. T83:7–11; T91:11–20; T93:6–13. Smith spoke with Silverman by telephone on July 29, August 2, August 4 and August 5, 1982 concerning whether Silverman had located the HOFEX references. T87:19–88:24; T95:2–4. On August 4, 1982 Silverman told Smith that he had located the December 15, 1980 Webster *memorandum.* T88:11–89:20.

Smith met with Silverman and Joseph for a final time on August 12, 1982. Smith asked Silverman whether he had found any references to Schiavone in the HOFEX case, Silverman responding, "We didn't

---

**2.** Special Prosecutor Silverman had issued a report on June 25, 1982 in which he concluded that there was insufficient evidence to support the allegations made against Donovan. *See* Banta Aff., Exh. F, at 12.

have it." T245:16–18. Silverman also stated that he had been informed that "the Director was in error," T247:10–12; *see also* T248:8–251:15, and said that he would ask the Director about it, and include his findings on the subject in his final report. T247:8–24; T248:17–19; T252:16–20; T278:5–8; T281:5–9. Smith claims that he understood such error to concern the phrase in the Webster memorandum to the effect that there were no suggestions of criminality, and not the phrase regarding the existence of references to Schiavone in the HOFEX files. T250:14–251:25. However, Mr. Joseph now states that Smith was told "that the name Schiavone did not in fact appear in the HOFFEX files." Aff. of Gregory P. Joseph (6/10/85) ¶ 2 (Plaintiff's Brief (6/11/85), Exh. B).

On August 12, 1982, based upon a discussion between Chief of Correspondents Duncan and Smith, one hundred lines were scheduled for "Donovan developments" in the "Nation" section of TIME, to be published on August 16, 1982, with an issue date of August 23, 1982. Banta Aff., Exh. P, at 27 (deposition of James P. Kelly). According to Smith, the objective of such coverage was "to make the public aware of shortcomings by the FBI and/or the Department of Justice in connection with the Donovan investigation," T55:4–6, and to expose "the cover-ups that took place in the bureau and in the Department of Justice that had the effect of sheltering the Secretary of Labor." T65:5–7. *See also* T94:3–8. On August 13, 1982, Smith submitted his file [3] to the New York bureau of TIME. As it related to the last paragraph of the August 23rd article, such file read as follows:

> Yet the performance of the FBI has been controversial, at least, in the investigations of Donovan's affairs before he became Secretary of Labor. Indeed, the Senate Labor Committee has opened an investigation of the Bureau's actions. In closed-door sessions on Capitol Hill this week, Executive Assistant FBI Director

Francis Mullen (who is also acting boss of the Drug Enforcement Agency) was interrogated about information withheld by the FBI last year while the Labor Committee was considering Donovan's nomination. This year, after Silverman opened his inquiry, he failed to receive some information gathered by the FBI in past investigations of the Genovese tribe with which, according to one FBI source whose report did come to light, "the upper management of the Schiavone Construction Company is closely aligned. The apparent gaps in the information provided by the Bureau are regarded by Silverman as inexplicable but not manipulative.

*　　*　　*　　*　　*　　*

At least one gap in the information the Special Prosecutor received from the FBI remains a mystery. Missing from the reports provided by the Bureau to Silverman were the references to the Schiavone Company in the FBI's investigation of the disappearance and presumed murder of the former Teamsters Union boss, Jimmy Hoffa.

The existence of the references to Donovan's company in the FBI files on the Hoffa case was revealed by the FBI last month in records yielded to congressional committees. The documents, the personal records of FBI Director William Webster, disclosed that he informed the Reagan transition team before Donovan was nominated that the name of the Schiavone Company appeared several times in the Hoffa case. On December 12, 1980, the information was telephoned by Webster to an aide of Ed Meese, now a top presidential aide and then chief of the Reagan transition force.

Salvatore (Sally Bugs) Briguglio, a New Jersey gangster and Teamster Union official, was a principal suspect in the FBI's investigation of Hoffa's disappearance in 1975. For the next three years, Briguglio was under constant surveillance by the Bureau. His slaying in 1978

---

**3.** A report submitted by a correspondent in relation to a particular story, known as "the file," is used by the writer to draft an article. *See* Defendant's Brief (5/15/85) at 18.

reputedly resulted from Mafia suspicions that he was talking to the government. The investigations by the Senate Labor Committee and the Special Prosecutor centered on charges—denied by Donovan—that Briguglio had collected payoffs from Donovan and the Schiavone Company in the past. Any reference to the Schiavone Company in the Hoffa files might have been produced by an informant or a wiretap, or, possibly, might have come from Briguglio himself. Whatever the source, the information would have been significant evidence in investigations of Donovan.

But neither the Senate Committee nor the Special Prosecutor was told of the mention of the Schiavone Company in the Hoffa files until Webster's records were surrendered to Congress recently. Silverman regards the matter as an imbroglio that can be explained only by the FBI. Up to now, Webster has not done that.

Banta Aff., Exh. Q at 4–5, 9–10.

Smith deliberately excluded from his file the deleted phrase, "but that none of these suggested any criminality or organized crime associations." T18:25–19:7. Although he would have included any "legitimately exculpatory" material, T76:23–77:15, Smith stated that he deleted this particular phrase as it was not central to the thrust of his story, T139:4–11, because it was contradicted by other information that Smith had, T77:20–25; T127:9–16; T141, and because it was ambiguous. T78:11–82:25. He chose to use the first part of the sentence, "... a company, Chivone (PH) ... had appeared a number of times in reports in our HOFEX case" even though he had not been able to substantiate the existence of the HOFEX references because "that was the only thing that was not challenged in Webster's memorandum that someone had told him about these HOFEX references." T353:6–11.

The August 23, 1982 article was written in New York by James Kelly, a staff writer for TIME, who relied completely on the file provided him by Smith. Banta Aff., Exh.

P, at 17:16–20. Kelly was thus not aware of the exculpatory language omitted from such file. The article was checked for accuracy by TIME researcher Michael Harris, who appears to have accomplished this solely by confirming various facts and versions of the story with Smith. Banta Aff., Exh. S (dep. of Michael P. Harris, at 16:17–7:7; 22:4–6; 42:11–13.) The article was then edited twice before printing. *See* Banta Aff., Exhs. T, U.

Since publication of the article, it has become clear that references to Schiavone Construction Company in the HOFEX files likely never existed. Hence, in a Supplemental Report filed September 10, 1982, Special Prosecutor Silverman reported that Director Webster had discovered that there were no references to Schiavone in the HOFEX files. Silverman wrote:

> With respect to the December 15, 1980, memorandum, Director Webster stated that the Hoffex reference is incorrect—that, at the time of the December 12, 1980, communications, the Hoffex files had not been checked. Moreover, the Director stated that files had recently been checked and it was determined that there were no references to SCC [Schiavone Construction Co.] therein.
> The Director attributed that erroneous Hoffex reference to information which he received from certain subordinates. He was uncertain as to which of the subordinates provided it. He states that he did not know where he would independently come up with the Hoffex reference since he was not particularly familiar with the details of that file.

Neary Aff., Exh. L, at 41. FBI Assistant Director in Charge of the Criminal Investigative Division Oliver B. Revell, Revell's Deputy, Charles Monroe, and Acting Administrator of the Drug Enforcement Administration Francis M. Mullen, all denied having checked the HOFEX file for references to Schiavone or Donovan in December, 1980. Revell added that "[d]uring the summer of 1982, after the Director's December 15 memorandum became a topic of public discussion, a review was conducted.

No references to Raymond (or Pat) Donovan or Schiavone (or Chiavone) were found. Moreover, no one associated with the Hoffa investigation had any recollection that the name of either Mr. Donovan or SCC ever arose in the course of the investigation." *Id.* at 42–43.

Additionally, seven Special Agents of the FBI who worked, at one time or another, on the HOFEX investigation, have come forward, and, in the form of affidavits, stated that they had not received any information in the course of such investigation implicating plaintiff Schiavone or Schiavone Construction Co., from informant Ralph Picardo, or elsewhere.[4] *See* Aff. of John M. Nersh (5/1/85); Jules J. Bonavolonta (5/2/85); John C. Ronay (5/2/85); John C. Luton (5/1/85); James M. Kossler (5/2/85); James C. Dooley (5/2/85); Francis J. Storey, Jr. (5/6/85). Additionally, Special Agent Paul F. Nolan has submitted two affidavits in which he details searches of the HOFEX files, which searches revealed no references to Schiavone. And, on October 1, 1982, Director Webster was interviewed by reporter Margaret Michaels of *Parade* Magazine. When asked about the HOFEX reference, Mr. Webster responded, "I know what they told me and now they can't find it. It's one of those things." T44:22–45:7.

The Report of the Special Counsel of the Committee on Labor and Human Resources, United States Senate, entitled *The Timeliness and Completeness of the Federal Bureau of Investigation's Disclosures to the United States Senate in the Confirmation of Labor Secretary Donovan,* published in May 1983, is critical of the FBI, and states as follows with respect to the Webster memorandum here at issue:

> Director Webster's memorandum to Mullen said that the FBI had reviewed "all our indices" and checked "all field offices." The Director said the investigation uncovered no suggestion of "any criminality or organized crime associations." The Director however had been "advised" (he only identified Messrs. Mullen and Revell) that Mr. Donovan's firm, the Schiavone Company "appeared a number of times in our HOFFEX (Hoffa Execution) case."

> If the FBI searched its central files not only for Mr. Donovan's name but also for the Schiavone Company, why didn't the FBI uncover that Schiavone was the "subject" of investigation in the Masselli or Gross investigations, if not the Kantor investigations?

Banta Aff., Exh. B, at 15. It notes that it now appears that such references do not exist, *see id.* at 37–38, and that Mr. Webster's claim that he misinformed the transition team in this regard demonstrates negligence in the performance of the FBI's duties. "The background investigation of a cabinet nominee demands greater care than this." *Id.* at 44. *See also Id.* at 46.

Finally, in the May 30, 1983 edition of TIME magazine, an article was published regarding this Senate Report. It included the following sentences:

> In his [Webster's] 1980 memo he stated that Schiavone showed up a number of times in the bureau's files on the Hoffa case, "but that none of these suggested any criminality or organized crime associations." Webster has since been unable to find these references and, chides the committee, "has no idea where he got that information. The background investigation of a cabinet nominee demands greater care than this."

Neary Aff., Exh. K.

## PROCEDURAL HISTORY

This action was filed on March 17, 1983. On August 13, 1983, the Honorable Herbert J. Stern granted defendant's motion to dismiss the action on the ground that the New Jersey fair report privilege barred plaintiffs' claim in that the article was "an accurate account of an official record or

---

**4.** These affidavits comprised the FBI's response to a letter from Robert P. Marshall, Jr., Assistant General Counsel of Time, Inc., in which Mr. Marshall theorized that Picardo was the source of Director Webster's belief that references to Schiavone existed in the HOFEX files. Such theory is, of course, exploded by the agents' affidavits.

proceeding." *Schiavone Construction Co. v. Time, Inc.,* 569 F.Supp. 614, 621 (N.D.J. 1983). On May 25, 1984, the United States Court of Appeals for the Third Circuit reversed, holding that there existed "a question of fact as to the fairness of TIME's summarization of the Webster memorandum so as to preclude a determination by the District Court that publication of the article was privileged as a matter of law." *Schiavone Construction Co. v. Time, Inc.,* 735 F.2d 94, 98 (3d Cir.1984). On June 28, 1984, TIME filed its answer, asserting numerous defenses, including truth, the fair report privilege and the neutral reportage privilege.

On December 5, 1984, the case was reassigned from Judge Stern to this court, the former having recused himself as a result of his involvement, as United States Attorney, in the investigation of the Hoffa disappearance. *See* Transcript of Proceedings (11/28/84). Now before the court are plaintiffs' motions to (1) strike TIME's truth defense and bar their invocation of the fair report and neutral reportage privileges; (2) declare that the allegedly libelous statements are defamatory *per se;* and (3) prevent TIME from engaging in discovery as to matters not related to the alleged references to plaintiffs in the FBI HOFEX files. Additionally, TIME moves for (1) partial summary judgment on the ground that the article at issue was not "of and concerning" plaintiff Ronald A. Schiavone; (2) summary judgment on the ground that Schiavone Construction Company is a public figure and that TIME did not act with actual malice; and (3) an order compelling discovery.

## DISCUSSION

Libel law is the battleground between the right to be secure in one's reputation, on the one hand, and the right to free speech on the other. *See generally Hutchinson v. Proxmire,* 443 U.S. 111, 133–34, 99 S.Ct. 2675, 2687, 61 L.Ed.2d 411 (1979) (citing cases). The Supreme Court has stepped in to resolve this conflict by creating "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The first amendment, the Court wrote, embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. at 270, 84 S.Ct. at 721 (citing cases). To create an exception for speech that is merely false, the Court continued, would chill free speech by dampening the vigor and limiting the variety of public debate; it would, the Court held, violate the Constitution. 376 U.S. at 279, 84 S.Ct. at 725. Since *New York Times v. Sullivan,* the Supreme Court has extended enhanced protection to public figures, as well as public officials. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). And, while it has not extended such protection to all matters of public or general concern, instead holding that

> ... so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 348, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974), the Court has nonetheless refused to allow states to impose punitive damages upon libel defendants without a showing of actual malice. 418 U.S. at 348–50, 94 S.Ct. at 3011. *See generally Marcone v. Pent-*

*house International Magazine for Men,* 754 F.2d 1072, 1080–81 (3d Cir.1985)

The State of New Jersey, whose law has already been determined applicable to this action, *see Schiavone, supra,* 735 F.2d at 96, has also attempted to accommodate the competing interests at stake in a defamation action, by creating certain statutory or common law privileges. *See generally Maressa v. New Jersey Monthly,* 89 N.J. 176, 190–91, 445 A.2d 376 (1982); *Swede v. Passaic Daily News,* 30 N.J. 320, 331–32, 153 A.2d 36 (1959); *Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 N.J. 552, 557–58, 117 A.2d 889 (1955). Hence, in New Jersey, one has an absolute privilege for statements made in the course of attorney disciplinary proceedings, *Matter of Hearing on Immunity for Ethics Complainants,* 96 N.J. 669, 477 A.2d 339 (1984), or in the course of judicial proceedings. *Rainier's Dairies, supra,* 19 N.J. at 558, 117 A.2d 889; *Petty v. General Accident Fire & Life Assurance Co.,* 365 F.2d 419, 421 (3d Cir.1966). Qualified privileges exist with respect to, for example, reports of official actions of proceedings, *Schiavone, supra,* 735 F.2d at 97; *Swede, supra,* 30 N.J. at 332–33, 153 A.2d 36; *Coleman v. Newark Morning Ledger Co.,* 29 N.J. 357, 379, 149 A.2d 193 (1959), citing *Restatement (Second) of Torts,* § 611, for statements made by public officials in the course of their duties, *Burke v. Deiner,* 97 N.J. 465, 475–78, 479 A.2d 393 (1984), or by any individual "upon any subject matter in which the party has an interest, or in reference to which he has a duty ... if made to a person having a corresponding interest or duty." *Coleman, supra,* 29 N.J. at 375, 149 A.2d 193; *Jorgensen v. Pennsylvania Railroad Co.,* 25 N.J. 541, 564, 138 A.2d 24 (1958). Unlike absolute privileges, qualified privileges may be lost if abused, or if the underlying statements are motivated by legal malice.

It is along these delicate lines of constitutional, statutory and common law privilege that the court now treads, ever wary of the compelling interests asserted by the competing sides. Because defamation is more than mere tort, important constitutional concerns come into play. With these principles in mind, the court now turns to the essentially technical analysis of the problem at hand.

## A. Defamation Per Se

■ The threshold question in every libel case is whether the language at issue is reasonably susceptible of a defamatory meaning. *Kotlikoff v. The Community News,* 89 N.J. 62, 67, 444 A.2d 1086 (1982), citing *Herrmann v. Newark Morning Ledger Co.,* 48 N.J.Super. 420, 429–30, 138 A.2d 61 (App.Div.1958). Such question is initially one for the court: only when the court finds the words to be capable of both a defamatory and a nondefamatory meaning does a question of fact arise for the jury to decide. *Lawrence v. Bauer Publishing & Printing Co.,* 89 N.J. 451, 459, 446 A.2d 469, *cert. denied,* 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982), citing *Herrmann, supra,* 48 N.J.Super. at 430, 138 A.2d 61. *See also Cibenko v. Worth Publishers, Inc.,* 510 F.Supp. 761, 764 (D.N.J.1981), citing *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 502 (3d Cir.1978), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); *Coleman, supra,* 29 N.J. at 382, 149 A.2d 193; *Mosler v. Whelan,* 28 N.J. 397, 404–05, 147 A.2d 7 (1958); *Leers v. Green,* 24 N.J. 239, 253, 131 A.2d 781 (1957); *Molnar v. Star Ledger,* 193 N.J.Super. 12, 17–18, 471 A.2d 1209 (App.Div. 1984).

Plaintiffs here argue that the article at issue is defamatory *per se, i.e.,* that it is not reasonably susceptible of a nondefamatory interpretation. Normally, this question is simply one of whether the words "sound to the disreputation" of plaintiffs, *Lawrence, supra,* 89 N.J. at 459, 446 A.2d 469, citing *Shaw v. Bender,* 90 N.J.L. 147, 149, 100 A. 196 (E. & A.1917); *Rainier's Dairies, supra,* 19 N.J. at 557, 117 A.2d 889; *see also Hoffman v. Weider,* 217 F.Supp. 172, 175 (D.N.J.1963), by holding them up to contempt, hatred, ridicule, aversion or disgrace. *See, e.g., Hall v. Heavey,* 195 N.J.Super. 590, 594, 481 A.2d

294 (App.Div.1984); *Stickle v. Trimmer*, 50 N.J.Super. 518, 522–23, 143 A.2d 1 (App. Div.1958); citing *Leers v. Green, supra*, 24 N.J. at 251, 131 A.2d 781; *Fenning v. S.G. Holding Corp.*, 47 N.J.Super. 110, 116, 135 A.2d 346 (App.Div.1957). In so determining, the court is to examine the publication as a whole and in context, *Cibenko, supra*, 510 F.Supp. at 764 (citing cases); *Dorney v. Dairymen's League Cooperative Association, Inc.*, 149 F.Supp. 615, 619 (D.N.J. 1957), and decide whether the average reader of such article would find it defamatory. *Molnar, supra*, 193 N.J.Super. at 18, 471 A.2d 1209; *Eadie v. Pole*, 91 N.J. Super. 504, 507–08, 221 A.2d 547 (App.Div. 1966) citing *Mosler v. Whelan, supra*, 28 N.J. at 405, 147 A.2d 7; *Neigel v. Seaboard Finance Co.*, 68 N.J.Super. 542, 552–53, 173 A.2d 300 (App.Div.1961) (citing cases).

Here, however, the court must squarely confront plaintiffs' argument that, simply because the article implies that they were involved in criminal conduct, it is actionable *per se.* Indeed, allegations of criminality are universally considered defamatory *per se. See, e.g., Hoagburg v. Harrah's Marina Hotel*, 585 F.Supp. 1167, 1170 (D.N.J. 1984); *Dorney, supra*, 149 F.Supp. at 619; *Gnapinsky v. Goldyn*, 23 N.J. 243, 250, 128 A.2d 697 (1957); *Arturi v. Tiebie*, 73 N.J.Super. 217, 222, 179 A.2d 539 (App.Div. 1962). Moreover, the fact that a crime is not explicitly charged is not dispositive, *Lawrence, supra*, 89 N.J. at 459, 446 A.2d 469 (statement that plaintiffs "may be" charged with criminal conduct is defamatory *per se* ); indeed, "the sting of an

accusation may be more pervasive when made by insinuation." *Molnar, supra*, 193 N.J.Super. at 18, 471 A.2d 1209 (statement that plaintiff failed to take a lie detector test in connection with suspected arson is defamatory *per se* ). *See also Rogozinski v. Airstream by Angell*, 152 N.J.Super. 133, 145, 377 A.2d 807 (App.Div.1977) (implication of criminality from the statement "He had to be continually watched and reminded with respect to the collection of monies ...").

These principles require the court to grant plaintiffs' application for partial summary judgment on this element of their defamation claim. The statement at issue implies that Schiavone was involved in some manner in the disappearance of Jimmy Hoffa: to be linked to such notorious event most certainly implies criminality. Indeed, such was the perspective of TIME itself, which noted, in the context of an article discussing the organized crime connections of Schiavone principal Raymond Donovan, that the mention of Schiavone in the HOFEX files "would surely have intrigued" the Senate and Special Prosecutor Silverman. Of course, this intrigue would have been absent were there not an implication of criminality, or some other involvement, likely adversely to affect Schiavone's reputation. That the article was primarily about the FBI's shortcomings, as defendant argues, is irrelevant: the relevant portion clearly defames Schiavone.[5] Its mo-

---

**5.** To the extent that it refers to the Schiavone Company the court notes that all jurisdictions agree that a corporation may be defamed. *Restatement (Second) of Torts* § 561 states:

One who publishes defamatory matter concerning a corporation is subject to liability to it

(a) if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it, or

(b) if, although not for profit, it depends upon financial support from the public, and the matter tends to interfere with its activities by prejudicing it in public estimation.

The general approach is to apply the same standards to corporate defamation as are applied in

personal defamation cases. Note, *Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation*, 75 Colum.L.Rev. 963 (1975). A corporation may be defamed by aspersions on its honesty, *Converters Equipment Corp. v. Condes Corp.*, 80 Wis.2d 257, 258 N.W.2d 712 (1977); *Local 15 of Independent Workers of Noble County, Inc. v. International Broth. of Elec. Workers*, 273 F.Supp. 313 (N.D.Ind.1967); reflections on its credit, *Mid-America Food Service, Inc. v. ARA Services, Inc.*, 578 F.2d 691 (8th Cir.1978), or statements that it has misrepresented the contents or quality of its products. *Dairy Stores, Inc. v. Sentinel Pub. Co., Inc.*, 191 N.J.Super. 202, 465 A.2d 953 (Law Div.1983), *aff'd*, 198 N.J.Super. 19, 486 A.2d 344 (App.Div.1984).

tion for partial summary judgment in this regard is, therefore, granted.

### B. *"Of and Concerning" Ronald A. Schiavone*

That the defamatory statements be "of and concerning" a plaintiff is an indispensable prerequisite to an action for defamation. *Durski v. Chaneles,* 175 N.J.Super. 418, 420, 419 A.2d 1134 (App.Div.1980), citing *Gnapinsky v. Goldyn, supra,* 23 N.J. at 253, 128 A.2d 697. *See also Restatement (Second) of Torts* § 564, at 165 (1977), *cited in Cibenko, supra,* 510 F.Supp. at 765. Indeed, it is a requirement that is, apparently, constitutionally mandated. *Rosenblatt v. Baer,* 383 U.S. 75, 81–82, 86 S.Ct. 669, 673–74, 15 L.Ed.2d 597 (1966) ("To the extent the trial judge authorized the jury to award respondent a recovery without regard to evidence that the asserted implication of the column was made specifically of and concerning him, we hold that the instruction was erroneous."), citing *New York Times v. Sullivan, supra,* 376 U.S. at 290–92, 84 S.Ct. at 731–32. Defendant here argues that such requirement is not met with respect to plaintiff Ronald A. Schiavone.

Such argument is not without a great deal of merit. The statement here alleged to be defamatory states that "[t]he personal files of FBI Director William Webster ... reveal that the name of Schiavone appeared several times in the bureau's reports on the 1975 disappearance of former Teamster Boss Jimmy Hoffa." The use of the word Schiavone in this sentence, in turn, refers back to an earlier discussion of a meeting between Ray Donovan, "then part owner of New Jersey's Schiavone Construction Co.," and two mobsters, one of which was William Masselli, "a member of the Genovese Mafia family and head of an excavation firm that did business with Schiavone." Such meeting, the article continued, was designed "to set up no-show jobs for Genovese mob members on Schiavone sites." Ronald A. Schiavone is never mentioned in the article. Hence, when it

later states that the "name of Schiavone appeared" in the HOFEX files, the only possible meaning to be attributed to the use of such name is in connection with the Schiavone corporation. The court finds that no reader could reasonably believe to the contrary. *Gnapinsky v. Goldyn, supra,* 23 N.J. at 253, 128 A.2d 697 (citing authorities).

That the article does not, therefore, explicitly refer to Schiavone, or use *his* name, does not, however, end the inquiry. *See Dijkstra v. Westerink,* 168 N.J.Super. 128, 133, 401 A.2d 1118 (App.Div.1979) ("... the actual naming of plaintiff is not a necessary element in an action for libel. It is enough that there is such reference to him that those who read or hear the libel reasonably understand the plaintiff to be the person intended."); *Weller v. Home News Publishing Co.,* 112 N.J.Super. 502, 508, 271 A.2d 738 (L.Div.1970) ("Neither the intent to defame nor the naming of the plaintiff is a necessary element in an action for libel."). Schiavone argues that, as 49.25 percent shareholder in a closely held firm,[6] of which he is Chairman of the Board of Directors and Chief Executive Officer, *see* Aff. of Ronald A. Schiavone (6/10/85) ¶ 2 ("Plaintiffs' Brief (6/11/85), Exh. B); Banta Aff., Exh. E, at 1, and which bears his name, any mention of the Schiavone Company may reasonably be understood as referring to him.

The court agrees. While some cases have held that a stockholder may not sue for the libel of a corporation, *United States Steel Corp. v. Darby,* 516 F.2d 961, 964 n. 4 (5th Cir.1975); *McBride v. Crowell-Collier Publishing Co.,* 196 F.2d 187 (5th Cir. 1952), citing *R.G. Dun & Co. v. Shipp,* 127 Tex. 80, 91 S.W.2d 330 (1936), and that the same is true of an officer, *see, e.g., Gilbert Shoe Co. v. Rumpf,* 112 F.Supp. 228, 229 (D.Mass.1953); *cf., McMillen v. Arthritis Foundation,* 432 F.Supp. 430, 432 (S.D.N.Y.1977) (Chairman of the Board and principal shareholder cannot sue for statement praising him but critical of his corporation);

---

**6.** Donovan owned an additional 38 percent. Schiavone Aff. ¶ 3.

*but see Brentwood Pharmacy, Inc. v. Sheppard,* 229 N.Y.S.2d 511, 512 (S.Ct. 1962) other courts have found defamation actions to lie for individuals involved in "a small business owned and operated by two individuals," *Shop Called East v. KYW— Channel 3,* 8 Med.L.Rptr. 1399, 1402 (D.N. J.1982) (Gerry, J.), citing *Kilpatrick v. Edge,* 85 N.J.L. 7, 88 A. 839 (E. & A.1913), or in a sole proprietorship, *see Patzer v. Liberty Communications, Inc.,* 58 Or.App. 679, 650 P.2d 141 (1982); *Annotation:* "Libel and slander: sufficiency of identification of plaintiff by matter complained of as defamatory," 100 A.L.R.2d 227, 294 (1965), citing *Bohan v. Record Publishing Co.,* 1 Cal.App. 429, 82 P. 634 (1905), particularly where, as here, the name of the individual plaintiff and that of the enterprise are the same. *See United States Steel Corp. v. Darby, supra,* 516 F.2d at 964 n. 4; *Patzer, supra,* 650 P.2d at 142 ("In the present case, defendants published the name of the corporation, but not plaintiff's name. However, because plaintiff's surname is part of the corporation name, it is possible that persons hearing the remarks would understand them to refer to plaintiff."); *Southland Publishing Co. v. C.E. Sewell,* 111 Ga.App. 803, 143 S.E.2d 428, 432 (1965) (citing cases). *Cf., DiGiorgio Fruit Corp. v. A.F. of L. & C.I.O.,* 215 Cal.App.2d 560, 30 Cal.Rptr. 350 (1963) (corporation can sue where individual after whom it is named is mentioned in defamatory statement), *cited in Annotation, supra,* 100 A.L.R.2d at 263 (citing cases in which plaintiff defamed where a name similar to his own was used in defamatory statement). *See also Annotation, supra,* 100 A.L.R.2d at 299 ("Imputations concerning the manner in which a specified business has been conducted have been held sufficiently [sic] to identify the officials responsible for the conduct of the pertinent phase of the business to support an individual action for defamation on their behalf."). *But see Chandless v. Borg,* 24 N.J.Super. 73, 88, 93 A.2d 651 (App.Div. 1952) (alleged defamation of law firm not libelous as to individual members thereof).

The court finds the latter cases to be applicable here, where the corporate entity is owned by a very few persons, of whom Schiavone is the principal one, where Schiavone is the Chairman of the Board of Directors, the Chief Executive Officer and the person who might well have been responsible for the major decisions of the corporation, and where the corporate entity bears Schiavone's name.

Of course, plaintiff Ronald Schiavone will ultimately be required to show that a reasonable reader, *see Shop Called East, supra,* 8 Med.L.Rptr. at 1402; *Gnapinsky, supra,* 23 N.J. at 253, 128 A.2d 697 (published statement must be understood to apply to plaintiff "by at least some third person"), found the statement here at issue to be "of and concerning" Mr. Schiavone.[7] Moreover, in light of the Supreme Court's decision in *Gertz,* to the effect that states cannot impose liability for defamation without fault, 418 U.S. at 347, 94 S.Ct. at 3010, Schiavone will have to show that defendant was, at least, negligent in failing to anticipate that the statement might be viewed as referring to him, and in not taking the appropriate action in light of such knowledge. *Restatement (Second) of Torts, supra,* § 564 Comment f, at 167. *See, e.g., Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 410 n. 3 (E.D.Pa.1983). *See Sisler v. Courier News Co.,* 199 N.J.Super. 307, 312–14, 489 A.2d 704 (App.Div.1985) (New Jersey has adopted negligence standard for non-public figures). For these reasons, defendant's motion to dismiss as against plaintiff Ronald A. Schiavone is denied without prejudice to its being renewed in light of the facts to be adduced at trial.

### C. *Fair Report*

Defendant here asserts the fair report privilege as a defense to plaintiffs' claim, arguing, in effect, that since the August 23, 1982 article was an "accurate and complete or a fair" report of the Webster memorandum, it cannot be held liable for the defamatory matter existing in such memo-

---

7. To this extent, the Affidavit of Elwood L. Baxter (6/6/85), stating that he understood the article to refer to Ronald Schiavone is probative, but not dispositive.

randum. The genesis of this privilege was traced by the Court of Appeals for the Third Circuit in *Medico v. Time, Inc.,* 643 F.2d 134 (3d Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981). There, the court noted that, with the advent of the republication rule, whereby the republisher of a defamatory statement adopted the statement as his or her own, "special problems" were created for the press.

> When a newspaper published a newsworthy account of one person's defamation of another, it was, by virtue of the republication rule, charged with publication of the underlying defamation. Thus, although the common law exonerated one who published a defamation as long as the statement was true, a newspaper in those circumstances traditionally could avail itself of the truth defense only if the truth of the underlying defamation were established.

> To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and the truth defense, the law has long recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings, the law abandons the assumption that the reporter adopts the defamatory remarks as his own.

643 F.2d at 137–38 (footnotes omitted). As the Court of Appeals noted in its earlier Opinion in this case, New Jersey also recognizes that "one who republishes defamatory matter is generally subject to liability as if he or she had originally published it," 735 F.2d at 96, citing *Rogers v. Courier Post Co.,* 2 N.J. 393, 66 A.2d 869 (1949); *Barres v. Holt, Rinehart & Winston, Inc.,* 131 N.J.Super. 371, 330 A.2d 38 (L.Div. 1974), *aff'd,* 141 N.J.Super. 563, 359 A.2d

501 (App.Div.1976), *aff'd,* 74 N.J. 461, 378 A.2d 1148 (1977) (per curiam); *Restatement (Second) of Torts* § 578 (1977), and has also adopted the fair report privilege in response, which privilege may "be defeated upon a showing that the report was inaccurate, incomplete, or an unfair abridgement of the proceeding," 735 F.2d at 97, citing *Coleman, supra,* 29 N.J. at 379, 149 A.2d 193; *Reilly v. Gillen,* 176 N.J.Super. 321, 327–28, 423 A.2d 311 (App.Div.1980); *Restatement (First) and (Second) of Torts* § 611 (1938) (1977), or upon a showing of malice. 735 F.2d at 97, citing *Swede, supra,* 30 N.J. at 333, 153 A.2d 36; *Coleman, supra,* 29 N.J. at 373–79, 149 A.2d 193; *Rogers, supra,* 2 N.J. at 393, 66 A.2d 869; *Nusbaum v. Newark Morning Ledger Co.,* 86 N.J.Super. 132, 137, 206 A.2d 185 (App.Div.1965).

Plaintiffs here contend that the article at issue constituted an unfair and inaccurate report of the Webster memorandum, in that it omitted the exculpatory language "but that none of these suggested any criminality or organized crime associations," while reporting that there were references to the name Schiavone in the HOFEX files. Since plaintiffs do not contest the existence of the fair report privilege, or its applicability to FBI reports in general, *Medico, supra,* 643 F.2d at 139–40, and this report in particular, *Schiavone,* 569 F.Supp. at 618; *see also Magrini v. The Bergen Evening Record,* No. 4063–83, unpub. op. (App.Div. April 25, 1985), the burden is theirs to prove that such privilege has been abused, here by virtue of defendant's failure fairly and accurately to report the contents of the Webster memorandum.[8] *See generally Molnar, supra,* 193 N.J.Super. at 21, 471 A.2d 1209; *Barbetta Agency, Inc. v. Evening News Publishing Co.,* 135 N.J.Super. 214, 218, 343 A.2d 105 (App. Div.1975); *Sokolay v. Edlin,* 65 N.J.Super. 112, 125, 167 A.2d 211 (App.Div.1961) (citing authorities). "Whether abuse of the

---

**8.** Though an issue when this matter first presented itself to the Court of Appeals, plaintiffs do not here contend that defendant should lose the fair report privilege as a result of malice. Rather, they rely completely on the unfairness of the report which unfairness, they assert, can only be viewed as intentional or reckless. *See* Plaintiffs' Reply Brief at 2. *Cf., Schiavone,* 735 F.2d at 97. *See also Restatement (Second) of Torts* § 611, comment b.

privilege has been shown is ordinarily a question for the jury, 'unless the facts are such that only one conclusion can reasonably be drawn.'" *Lavin v. New York News,* 757 F.2d 1416, 1419 (3d Cir.1985), quoting *Restatement (Second) of Torts* § 619(2) comment b. *See also Coleman, supra,* 29 N.J. at 382, 149 A.2d 193; *Leers v. Green, supra,* 24 N.J. at 255, 131 A.2d 781; *Nusbaum, supra,* 86 N.J.Super. at 137–38, 206 A.2d 185.

In determining the fairness of the report, the court is to be guided by comment f to section 611 of the *Restatement. See Lavin, supra,* 757 F.2d at 1419; *Schiavone,* 735 F.2d at 97; *Reilly, supra,* 176 N.J.Super. at 328, 423 A.2d 311. That comment states, in pertinent part:

> The rule stated in this Section requires the report to be accurate. It is not necessary that it be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting. It is enough that it conveys to persons who read it a substantially correct account of the proceedings.
>
> Not only must the report be accurate, but it must also be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article. The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties.

The Third Circuit has "distilled" this standard to a simple inquiry, which, as applied in this case, can be stated as follows: do the Webster memorandum and the text of the article have equal "sting"? *Lavin, supra,* 757 F.2d at 1419–20, citing *Brown & Williamson Tobacco Co. v. Jacobson,* 713 F.2d 262, 271 (7th Cir.1983).

█ Clearly, they do not. The Webster memorandum, after stating that there were references to the name Schiavone in the HOFEX files, continues, "but ... none of these suggested any criminality or organized crime associations." The article omits this language, which is of an exculpatory nature and certainly lessens the "sting" of the clause that preceeded it. Indeed, the article runs afoul of the explicit proscription of the Restatement comment by omitting the exculpatory while reporting the "discreditable," all based upon the reporter's own impressions. As a result, it imputes criminality where the memorandum disclaimed it; it thus renders harmful that which was, at worst ambiguous and at best, entirely harmless.

Defendant argues that facts known to it required that it omit such exculpatory language, which it knew to be untrue. Even assuming that which is far from obvious—that the exculpatory language refers to the entirety of the FBI's files and not merely to the records of their HOFEX investigation—reporter Smith's reasons for omitting such language go to the truth of these articles as a whole or, if false, to his negligence or malice in writing it as he did. It does not, however, justify what is essentially an inaccurate and unfair report of the Webster memorandum. Nor does the fact that the Senate would, in fact, have wanted to know about Mr. Webster's belief that HOFEX references existed render accurate that which is not.

█ The fair report privilege is a technical defense which allows the press to report defamatory matter appearing in, for example, FBI memoranda, because the existence of such matter is itself newsworthy, and ought to be reported, in the interests of public supervision and awareness of what is occurring in governmental agencies. *See Medico, supra,* 643 F.2d at 140–

43. It is, however, a defense which requires the court not to focus upon the underlying truth, as defendant urges, but upon the fairness and accuracy of the report at issue. *Id.* at 137–38 and n. 11. No reasonable juror could find defendant's report of the Webster memorandum to be fair and accurate; the facts are such that only the contrary conclusion can be drawn. TIME's defense of fair report is, therefore, stricken.[9]

### D. *Truth*

Truth, of course, is a complete defense to the publication of a defamatory statement. *Lawrence, supra,* 89 N.J. at 460, 446 A.2d 469; *Neigel v. Seaboard Finance, supra,* 68 N.J.Super. at 552, 173 A.2d 300 (citing cases). Thus, even if maliciously made, a true statement is not actionable. *See Medico, supra,* 643 F.2d at 138 and n. 12. Truth is measured with reference to the particular allegations of defamation in a plaintiff's complaint, *see Medico, supra,* 643 F.2d at 145 n. 36, citing W. Prosser, *Handbook of the Law of Torts* 798 (4th ed. 1971); Sowle, *Defamation and the First Amendment: The Case for A Constitutional Privilege of Fair Report,* 54 N.Y.U. L.Rev. 469, 501–08 (1979), here, that the final paragraph of the TIME article was false. Complaint ¶¶ 5–6. Plaintiffs now argue, and defendant appears to concede, that the truth defense goes not to the existence of the Webster memorandum, but to the fact of references to Schiavone in the HOFEX files. *Lawrence, supra,* 89 N.J. at 461, 446 A.2d 469, citing *Restatement (Second) of Torts* § 578, comment b; *Medico, supra,* 643 F.2d at 137–38. *See also* Plaintiffs' Brief (11/26/84) at 38; Defendant's Brief (1/14/85) at 33–36. Moreover, the "sting" of the article—and that which the court has found to be defamatory *per se*—derives from the statement that "the name of Schiavone appeared several times in the bureau's report on the 1975 disappearance of former Teamster Boss Jimmy Hoffa." *See supra* at 24, 33. For the truth defense to apply, "the truth must be as broad as the defamatory imputation or 'sting' of the statement." *Lawrence, supra,* 89 N.J. at 460, 446 A.2d 469, citing *Rogozinski, supra,* 152 N.J.Super. at 146–47, 377 A.2d 807; Prosser, *supra,* § 116; *Medico, supra,* 643 F.2d at 137; *Rogers, supra,* 2 N.J. at 401, 66 A.2d 869. Hence, as defendants concede, they must show the substantial truth of the statement at issue.[10] Defendant's Brief at 35. *See Leers v. Green, supra,* 24 N.J. at 257, 131 A.2d 781, *cited in Herrmann, supra,* 48 N.J.Super. at 431–32, 138 A.2d 61 (immaterial untruth does not render otherwise true statement defamatory). *See also Restate-*

9. This holding eviscerates the need to confront plaintiff's contention that the fair report privilege does not apply where, as here, defendant claims such privilege as a result of information gathered, at least initially, from sources which remain confidential. Plaintiffs' Brief (11/26/84) at 32, citing *Bufalino v. Associated Press,* 692 F.2d 266, 271–72 (2d Cir.1982), *cert. denied,* 462 U.S. 1111, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983).

It also renders unnecessary any discussion of the neutral reportage privilege since, whatever the status of this privilege in the Third Circuit, *see Medico, supra,* 643 F.2d at 144–45 and n. 38, citing *Dickey v. CBS, Inc.,* 583 F.2d 1221, 1225–26 (3d Cir.1978), neutral reportage affords first amendment protection only to "the accurate and disinterested reporting" of statements of a "responsible, prominent organization." *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 120 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), citing *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). Having found the TIME report of the Webster memorandum to be too inaccurate to warrant fair report status, the court cannot now find that it nonetheless deserves protection under the neutral reportage doctrine; TIME's reporting, simply stated, was not "neutral."

10. Despite the Third Circuit's doubts as to whether it is constitutional to impose the burden of proving truth on the defendant, as at common law, *see Medico, supra,* 643 F.2d at 146 n. 40 (citing cases), New Jersey apparently continues to do so. *See Lawrence, supra,* 89 N.J. at 460–62, 446 A.2d 469; *Dijkstra, supra,* 168 N.J. Super. at 134, 401 A.2d 1118. Nonetheless, plaintiffs here assume that burden, as they must on a motion for summary judgment. *See, e.g., Reilly v. Firestone Tire and Rubber Co.,* 764 F.2d 167, 173–74 (3d Cir.1985). *See* Plaintiffs' Reply Brief (1/21/85) at 23. The court evaluates this motion accordingly.

ment (Second) of Torts § 581A, comment f.

■ The undisputed facts of record leave no possible doubt but that the statement "the name of Schiavone appeared several times [in the HOFEX files]" is false. Such files have been checked and rechecked, and there is no evidence whatsoever, either that references to Schiavone now exist, or that such references ever existed, in such files. Nor do those FBI agents familiar with the file recall any such references. *See supra* at 15. Indeed, on September 10, 1982, Special Prosecutor Silverman, who had always maintained that no evidence existed linking Schiavone to the HOFEX case, reported that Mr. Webster admitted that the HOFEX file was not checked for Schiavone references prior to his writing the memorandum at issue, and that a check since that time revealed no such references.[11] *See also* Aff. of Paul F. Nolan (3/6/85) ¶¶ 6–11 (searches prior to publication of article).

Besides relying on the "assumption," flowing from Mr. Webster's high office, "that the statement in the memorandum had some basis," Defendant's Brief (1/14/85) at 34, defendant's only response to these facts is that, because there were so many references to Schiavone in other FBI files, it is immaterial that there were none in the HOFEX files. Such contention ignores the special "sting" identified by plaintiffs as the subject of this action, stemming from a statement connecting one with the infamous disappearance of Jimmy Hoffa; moreover, it is plaintiffs' right to frame the defamatory statement as they will. *See supra* at 35–36. Moreover, black letter law is clear: truth is no defense where the plaintiff "is found to have engaged in some other substantially different kind of misconduct even though it is equally or more reprehensible." *Restatement (Second) of Torts* § 581A, comment f. *See also* Plaintiffs' Brief (1/21/85) at 30–31

(citing cases). "It is . . . the truth or falsity of the particular charge that is to be determined." *Restatement (Second) of Torts* § 581A, comment f.

The court thus concludes that absolutely no disputed facts exist as a result of which the court could find a genuine issue to remain regarding the truth of the statement at issue. Plaintiffs will, therefore, be granted summary judgment on this element of their defamation claim, leaving only the question of defendant's fault for consideration.

### E. *Public Figure*

It is now established that the TIME article here at issue both defamed plaintiffs and was untrue. It only remains to be determined whether the article gives rise to liability on the part of defendant. The first part of that inquiry requires the court to determine the appropriate standard by which to judge defendant's action in publishing the defamatory statement regarding plaintiffs. As discussed, *supra,* at 19–20, that inquiry, in turn, depends upon whether or not plaintiffs are public figures.

In *Gertz v. Robert Welch, Inc., supra,* the Supreme Court defined two classes of public figures. "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." 418 U.S. at 351, 94 S.Ct. at 3012. So-called "all purpose public figures" distinguish themselves by occupying "positions of . . . pervasive power and influence," *id.* at 345, 94 S.Ct. at 3009, but "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of a society, an individual should not be deemed a public personality for all aspects of his life." *Id.* at 352, 94 S.Ct. at 3013. Though an argument could be made that, even prior to the publication of the article here at issue, Schiavone had become "a household word," *see Tavoulareas v.*

---

11. Mr. Webster's imprecise quotation, in an October 1, 1982 magazine interview that "I know that they told me and now they can't find it. It's one of those things," T44:22–45:7, establishes

no more than that Webster was told of such references. It cannot prove their existence, in light of the other evidence here revealed.

*Piro,* 759 F.2d 90, 103 n. 12 (D.C.Cir.1985), *rh'g en banc granted,* 763 F.2d 1472 (D.C. Cir.1985), defendant does not contend that plaintiffs are all-purpose public figures. *See* Defendant's Reply Brief (7/1/85) at 17 n. *.

The second type of public figure is the limited purpose public figure. Thought by the Supreme Court to be "more common," the limited purpose public figure is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3012. *See also Id.* at 345, 94 S.Ct. at 3009. It is this status which defendant argues plaintiffs have attained, by virtue of their association with former Secretary Donovan, their involvement in the controversy involving Donovan's nomination and their status as a corporation having substantial government contracts. Defendant's Brief (5/15/85) at 45–58.

The question of whether one is a public figure is a question of law, to be determined by the court. *Marcone, supra,* 754 F.2d at 1081 n. 4 (citing cases); *Lawrence, supra,* 89 N.J. at 462, 446 A.2d 469; *Gomez v. Murdoch,* 193 N.J.Super. 595, 599, 475 A.2d 622 (App.Div.1984). As recently made clear by the Third Circuit, in deciding this issue, the court is to consider (1) whether the controversy surrounding Donovan's nomination was a "public controversy;" and (2) the "nature and extent" of plaintiffs' participation in such controversy. *McDowell v. Paiewonsky,* 769 F.2d 942, 948 (3d Cir.1985); *Marcone, supra,* 754 F.2d at 1082, citing *Gertz, supra,* 418 U.S. at 352, 94 S.Ct. at 3013; *Avins v. White,* 627 F.2d 637, 647 (3d Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980). *See also Tavoulareas, supra,* 759 F.2d at 103 n. 12 ("The court must (1) define the precise controversy involved, (2) analyze the plaintiff's role in the controversy, and (3) determine if the defamatory material was germane to the plaintiff's participation in the controversy."), citing *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296–98 (D.C.Cir.),

*cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *Lerman v. Flynt Distributing Co., Inc.,* 745 F.2d 123, 136–37 (2d Cir.1984) (defendant must show that plaintiff has "(1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media."); *Fitzgerald v. Penthouse International, Ltd.,* 691 F.2d 666, 668 (4th Cir.1982) (requirements for limited purpose public figure are (1) that plaintiff have access to channels of effective communication; (2) that plaintiff voluntarily assume a role of special prominence in a public controversy; (3) that plaintiff seek to influence the outcome of such controversy; (4) that controversy existed prior to publication of the alleged defamatory statements; and (5) that plaintiff retained public figure status at the time of defamation), *cert. denied,* 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (1983); *Clark v. American Broadcasting Companies, Inc.,* 684 F.2d 1208, 1218 (6th Cir. 1982) (public figure status turns on the existence of a public controversy and the nature and extent of plaintiff's involvement in such controversy, as measured by (1) whether participation in the controversy is voluntary; (2) the extent to which there is effective access to the media to counteract false statements; and (3) the prominence of the role played in the controversy), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983). The inquiry that results is difficult and fact-specific. Indeed, the Third Circuit has recently described it as "much like trying to nail a jelly fish to the wall." *Marcone, supra,* 754 F.2d at 1082, quoting *Rosanova v. Playboy Enterprises, Inc.,* 411 F.Supp. 440, 443 (S.D.Ga. 1976), *aff'd,* 580 F.2d 859 (5th Cir.1978). Upon consideration of all the relevant facts, however, the court finds that, for purposes of this litigation, plaintiffs should be considered public figures.

Such conclusion stems, first, from the highly public nature of the controversy addressed by the article. That controversy is best defined as the dispute surrounding Raymond Donovan's nomination to be Secretary of Labor, and the extent to which the investigation of his qualifications for such job was properly conducted.[12] It is beyond cavil that such controversy is a genuine public controversy, "a real dispute, the outcome of which affects the general public or some segment of it." *McDowell, supra,* at 948; *Marcone, supra,* 754 F.2d at 1083 (citing cases). Donovan's nomination to one of our nation's highest offices is precisely the sort of issue regarding which the *New York Times Co. v. Sullivan* Court voiced our "profound national commitment to the principle that debate ... should be uninhibited, robust, and wide-open," 376 U.S. at 270, 84 S.Ct. at 721, and to "[t]he right of free public discussion of the stewardship of public officials...." *Id.* at 275, 84 S.Ct. at 723, citing 4 Elliot's Debates on the Federal Constitution 575 (1876). Far from the "cause celebre" embodied in the divorce of wealthy individuals, which the Supreme Court characterized as "not the sort of 'public controversy' referred to in *Gertz,*" *Time, Inc. v. Firestone,* 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976), which divorce was "merely newsworth[y]," *see Wolston v. Reader's Digest Association,* 443 U.S. 157, 167–68, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979), the issue of whether Secretary Donovan was fit to serve, and the way in which the FBI investigated such fitness, was a public controversy of the highest order. Nor do plaintiffs seriously argue otherwise.

Of course, the *Gertz* Court rejected the notion that a public controversy, standing alone, requires that an actual malice standard be applied to defamation cases related thereto. 418 U.S. at 342–46, 94 S.Ct. at 3008–10, overruling *Rosenbloom v. Me-*

*tromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Thus, the court is now required to analyze the nature and extent of plaintiffs' participation in the controversy at issue. The Supreme Court has, of late, made clear that such nature ought to be "voluntary" for a defamation plaintiff to become a public figure. *Wolston, supra,* 443 U.S. at 166–68, 99 S.Ct. at 2706–07; *Hutchinson, supra,* 443 U.S. at 135, 99 S.Ct. at 2688; *Firestone, supra,* 424 U.S. at 453–54, 96 S.Ct. at 964–65. Indeed, the Third Circuit has recently stated, "It is true that becoming a public figure generally involves some notion of voluntariness." *McDowell, supra,* at 949. *See also Marcone, supra,* 754 F.2d at 1083. ("In general, to be a limited purpose public figure, the plaintiff must voluntarily thrust himself into the vortex of the dispute").

What is and is not voluntary is by no means self-evident. Thus, the Third Circuit has delineated several measures thereof. First, "[i]n the typical limited purpose public figure case, the plaintiff actively participates in the public issue in a manner intended to obtain attention." *Id.* at 1083, citing *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 273–74 (3d Cir.1980) (aggressive advertising); *Woy v. Turner,* 573 F.Supp. 35 (N.D.Ga.1983) (holding press conferences). Second, in certain cases, "the plaintiff's action may itself invite comment and attention, and even though he does not directly try or even want to attract the public's attention, he is deemed to have assumed the risk of such attention." *Marcone, supra,* 754 F.2d at 1083, citing *Rosanova, supra;* Smolla, *Let the Author Beware: The Rejuvination of the American Law of Libel,* 132 U.Pa.L.Rev. 1, 68–71 n. 8 (1983). *See also McDowell, supra,* at 949. Hence, sports figures, or others who have chosen particular spheres of activity which regularly lead to fame and notoriety in the community, are deemed voluntarily

---

**12.** Indeed, plaintiffs appear to concede that the controversy should be defined as that "surrounding the fitness of Labor Secretary Donovan to hold office." Plaintiffs' Brief (6/11/85) at 43. *See also Id.* at 56. Though elsewhere, they define the public controversy at issue as that surrounding the disappearance and suspected murder of Jimmy Hoffa, *id.* at 50, 56, they concede that this controversy too is of a public nature. *Id.* at 41, quoting *Schultz v. Reader's Digest Association,* 468 F.Supp. 551, 558 (E.D. Mich.1979).

to have exposed themselves to publicity regarding such activity. *McDowell, supra,* at 949–50; *Marcone,* 754 F.2d at 1083–84, quoting *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir.1979) (en banc); *Barry v. Time, Inc.,* 584 F.Supp. 1110, 1113 (N.D.Cal.1984). Notably, the Third Circuit has endorsed the holding of the Fifth Circuit to the effect that a reputed underworld personality, Louis Rosanova, was a public figure in the context of his connection to organized crime. *Marcone, supra,* 754 F.2d at 1084, citing *Rosanova, supra.* The court wrote

> Although never convicted of a crime, Rosanova had been the subject of governmental investigations and criminal prosecutions. 411 F.Supp. at 444. Moreover, his alleged underworld ties had been the subject of considerable media attention. Asserting that he never sought such a status, Rosanova vigorously argued he was not a public figure. However, because some of his contacts with underworld figures were not denied, the court held that Rosanova voluntarily engaged in a course of activity that was bound to invite attention and comment.

754 F.2d at 1084. The court thus concluded, contrary to plaintiffs' assertions herein, that one cannot avoid public figure status by arguing that one did not want it. 754 F.2d at 1084, quoting *Rosanova,* 580 F.2d at 861. *See also McDowell, supra,* at 950–51. It explicitly rejected the argument, advanced by plaintiffs, that there is no such thing as an "involuntary public figure." Though cautioning that "the instances of truly involuntary public figures must be exceedingly rare," 754 F.2d at 1084 n. 9, quoting *Gertz, supra,* 418 U.S. at 345, 94 S.Ct. at 3009, the court wrote

> ... we view such a description as merely one way an individual may come to be considered a general or limited purpose public figure. Thus, to the extent a person attains public figure status by position, status, or notorious act he might be considered an involuntary public figure. The one group of individuals that might truly be considered involuntary public figures are relatives of famous people.

754 F.2d at 1084 n. 9 (citing cases).

■ This court is, of course, bound to follow the analysis set forth by the Third Circuit. Such analysis compels the conclusion that plaintiffs are public figures.[13] First, plaintiffs, in fact, engaged in affirmative acts regarding the instant controversy "in a manner intended to obtain attention." Initially, plaintiffs involved themselves in extensive campaigning on behalf of then-candidate Ronald Reagan, *see* Banta Aff., Exh. F, at 649–81 (Report of the Special Prosecutor, regarding allegations of election law violations on the part of Schiavone and Donovan), campaigning which, it can be inferred, was a factor in the nomination that triggered this controversy. Once the nomination occurred, becoming immediately a topic of great public interest, and enormous press coverage, much of which mentioned Schiavone, *see* Banta Aff., Exh. I (articles uncovered in computer search), plaintiffs set about "to influence the resolution of the issue involved," *Lawrence, supra,* 89 N.J. at 464, 446 A.2d 469, citing *Wolston, supra,* 443 U.S. at 168, 99 S.Ct. at 2707; *Gertz, supra,* 418 U.S. at 341, 94 S.Ct. at 3007; *see also Firestone, supra,* 424 U.S. at 454–55 n. 3, 96 S.Ct. at 965–66 n. 3, by publically hiring private detectives to investigate those making allegations regarding Donovan and Schiavone, as well as members and staff of the Senate Labor Committee, *see* Banta Aff., Exh. H ("Donovan's ex-firm sleuths the charges," *Newark Star Ledger* (5/18/82); "Donovan's firm probes leaks charging mob ties," *Chicago Sun-Times* (5/18/82); "Donovan is Probing His Probers," *Washington Post* (5/19/82)), and later, by writing numerous letters to editors and even meeting with the editor of the *Bergen Record. See* Banta Aff., Exh. G

---

**13.** Plaintiffs' status in this regard is identical one to the other. The court's holding, *supra,* at 26–29, that defamation of Schiavone Construction Co. may be "of and concerning" plaintiff Ronald Schiavone, simply because the two are inextricably intertwined by name and corporate structure, requires that if one is deemed a public figure so must the other be.

(dep. of Ronald A. Schiavone) at 82:8–83–5; 84:6–86:15. Though the latter appeared after publication of this article, and are thus not probative of plaintiffs' efforts to influence the outcome of the controversy at issue, *see Hutchinson, supra,* 443 U.S. at 134–35, 99 S.Ct. at 2687–88 (one may respond to charges without jeopardizing private individual status), it is undisputed that, as in *McDowell* and *Marcone,* there was extensive publicity involving Schiavone prior to the publication of the article at issue, some of it based upon efforts by Donovan and Schiavone to combat the charges levelled at them.

Second, plaintiffs' "status" renders them limited purpose public figures in two manners. First, and most obviously, they were closely connected to Donovan, both prior to his nomination and after it; indeed, discussion of Donovan could hardly proceed without discussion of his ties to the Schiavone Construction Co. Such links were strengthened after the attacks on Donovan began: Donovan spoke out in defense of the company, *see, e.g.,* Banta Aff., Exh. H ("Donovan defends N.J. biz incidents", *New York Times* (1/18/81)), while the company initiated an inquiry into where the Senate Labor Committee had received its information regarding the allegations regarding Donovan, in an attempt to "restor[e] the company's reputation." *See, e.g., Id.* ("Donovan's firm probes leaks charging mob ties," *supra* ). Moreover, the Schiavone Company bragged of its association with Donovan in the 1981 publication *Schiavone: The First 25 Years.* Banta Aff., Exh. E, -at 3. Hence, even if plaintiffs' association with Donovan alone, were not enough to render them public figures, *but see Marcone, supra,* 754 F.2d at 1084 and n. 9, citing, *e.g., Carson v. Allied News*

*Co.,* 529 F.2d 206, 210 (7th Cir.1976) (wife of famous entertainer a public figure); *Barger v. Playboy Enterprises, Inc.,* 564 F.Supp. 1151, 1156 (N.D.Cal.1983) (wives of Hell's Angels are public figures), *aff'd,* 732 F.2d 163 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984); *Meeropol v. Nizer,* 381 F.Supp. 29 (S.D.N.Y.1974) (children of Julius and Ethyl Rosenberg are public figures),[14] their pre-publication acts connecting them with Donovan, and with the controversy surrounding him, was. *Marcone, supra,* 754 F.2d at 1086. Second, like Rosanova, prior to the publication of the article here at issue, plaintiffs had been the subject of several governmental investigations, some of a criminal nature, and were alleged to have "considerable underworld ties [which] had been the subject of considerable media attention." *Marcone,* 754 F.2d at 1084, citing *Rosanova, supra.* To this extent too, then, plaintiffs' status, which they voluntarily assumed, renders them public figures for the limited purpose of an investigation into the nature of that status.

As in *Marcone,* if each element of the equation is taken separately it may be argued that no one aspect may be sufficient to create public figure status. Nevertheless, when all the relevant factors are considered in context and as a whole, plaintiffs herein, like Marcone "[cross] the line from private to limited purpose public figure." 754 F.2d at 1086. In this regard, there are two additional considerations of which the court here takes note, including them in such equation. First, one rationale for the heightened standard applied to allegations of defamation for public figures is their "significantly greater access to the channels of effective communication and ... more realistic opportunity to counteract

---

**14.** As defendant points out, one can achieve status by association other than with family members. *See, e.g., Rebozo v. Washington Post Co.,* 637 F.2d 375, 380 (5th Cir.) ("Rebozo's activities—including his association with President Nixon, taking part in his financial affairs, and involvement with the re-election effort—made him a prime subject of public comment."), *cert. denied,* 454 U.S. 964, 102 S.Ct. 505, 70 L.Ed.2d 379 (1981); *Brewer v. Memphis Publishing Co.,*

*Inc.,* 626 F.2d 1238, 1255 (5th Cir.1980) (plaintiff a public figure "not only because of her entertaining but also as the entertainer who was Presley's 'girlfriend' "), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 973 (1981). Though distinguishable on their facts, these cases nonetheless stand for the proposition that non-family associations may give rise to public figure status.

false statements than private individuals enjoy." *Gertz, supra,* 418 U.S. at 344, 94 S.Ct. at 3009. *See also McDowell, supra,* at 947. The existence of such access is thus a factor often considered in determining whether one is a public figure. *Hutchinson, supra,* 443 U.S. at 134–35, 99 S.Ct. at 2687–88; *Steaks Unlimited, supra,* 623 F.2d at 274; *see also supra* at 37–38 (citing cases). Here, Schiavone's access to the press is undeniable: of the one hundred letters he wrote complaining about coverage or seeking retractions, about forty were published by the addressee publications, Banta Aff., Exh. G, at 84–85. Additionally, Schiavone was apparently able to meet with editors of the *Bergen Record* and persuade them to alter their coverage of the controversy. *Id.* at 82–83. And, while these actions were taken subsequent to the publication of the article here at issue, and thus do not indicate that plaintiffs had thrust themselves into the ongoing controversy at that time, they are probative of their access to the media throughout this period of time. Such access was clearly greater than that possessed by average, private individuals, nor have plaintiffs presented evidence to the contrary. For this reason too, then, plaintiffs appear to have gained public figure status.

Finally, defendant argues, with some force, that as a corporation, and particularly a corporation which does 98 percent of its business working on public contracts, Banta Aff., Exh. G. at 113:10–23, plaintiff Schiavone Co. should be treated as a public figure, and allowed to recover only upon a showing of malice. The former argument has been rejected by most courts, which have applied the same analysis to corporations as they would to individuals. *Brown & Williamson, supra,* 713 F.2d at 273. *See, e.g., Golden Bear Distributing Systems, Inc. v. Chase Revel, Inc.,* 708 F.2d 944, 952 (5th Cir.1983); *National Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.,* 705 F.2d 98, 101–02 (4th Cir.1983); *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 589–90, 244 Ct.Cl. 583 (1st Cir. 1980), citing *Trans World Accounts, Inc.*

*v. Associated Press,* 425 F.Supp. 814 (N.D. Cal.1977); *Vegod Corp. v. American Broadcasting Companies, Inc.,* 25 Cal.3d 763, 160 Cal.Rptr. 97, 603 P.2d 14, 18 (1980); *Foodscience Corp. v. McGraw-Hill, Inc.,* 592 F.Supp. 362, 365–66 (D.Vt.1984). One court, however, has held to the contrary, applying the *Rosenbloom* standard to corporations because "corporations are similar to public figures in that neither have private lives," *Martin Marietta Corp. v. Evening Star Newspaper,* 417 F.Supp. 947, 956 (D.D.C.1976), and holding that the standard applied ought to reflect only whether a public issue is presented. *Cf., Reliance Insurance Co. v. Barron's,* 442 F.Supp. 1341, 1347–48 (S.D.N.Y.1977) (rejecting Martin Marietta but holding plaintiff a public figure based upon its size and the fact that it is publicly traded). The Third Circuit has applied the traditional *Gertz* test, while leaving the issue open, *Steaks Unlimited, supra,* 623 F.2d at 273–74 and n. 47.

Of course, *Gertz* left the issue open, too, allowing states to impose higher standards of proof upon plaintiffs if they so desired. 418 U.S. at 347, 94 S.Ct. at 3010. New Jersey's highest court has not yet ruled on this question, but a recent decision of the Superior Court, Law Division, leads the court to believe that New Jersey might require higher standards with respect to corporations. Thus, in *Dairy Stores, Inc. v. Sentinel Publishing Co., Inc.,* 191 N.J. Super. 202, 465 A.2d 953 (L.Div.1983), *aff'd without opinion,* 198 N.J.Super. 19, 486 A.2d 344 (App.Div.1984), the court held that the scope of first amendment protections "should be determined not by a mechanistic application of terms such as 'public figure' and 'public controversy' but rather by an independent examination of the first amendment and other competing societal values involved in the context of business defamation." 191 N.J.Super. at 214, 465 A.2d 953. It thus held that, at least with respect to products, a public figure standard should apply, in that (1) "a 'consumer's interest in the free flow of commercial information ... may be as keen, if

not keener by far, then his interest in the day's most urgent political debate.' Therefore, customers have a First Amendment interest in obtaining information about the products and services they buy which is comparable to their interest in being informed about political and social issues," 191 N.J.Super. at 214, 465 A.2d 953 (citing cases); and (2) "a business voluntarily exposes itself—or at least its product or service—to public examination in much the same fashion as does a public official or figure." *Id.* at 215, 465 A.2d 953. Thus, the court concluded, "Consumer Reports is entitled to the same First Amendment protections when it reports that a consumer product is unsafe or unhealthy or is marketed through misrepresentations as the New York Times enjoys when it reports that a public official has violated the public trust or is unfit for his position." *Id.* at 216, 465 A.2d 953.

Though one would argue that such analysis applies to the Schiavone Company to the extent that the Donovan controversy reflected the performance it rendered—of course, such performance was of much lower quality if it, in fact, provided the no-show jobs alleged. Moreover, to the extent that Schiavone was a public contractor, still greater first amendment protection, and a correspondingly higher standard of proof, might be argued to apply. Indeed, in a recent case, the Court of Appeals for the Third Circuit held that the decision to work on public projects is a voluntary act rendering one a limited purpose public figure, since such projects—especially controversial ones—necessarily [engender] public scrutiny." *McDowell, supra,* at 950. *See also* R. Sack, *Libel, Slander and Related Problems,* § V.3.1.9., at 209 (1980). *But see Artic Co., Ltd. v. Loudoun Times Mirror,* 624 F.2d 518, 521–22 (4th Cir.1980), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981) (government consultant not a public figure). The court does not here find these factors to be controlling: it cannot predict that the Supreme Court of New Jersey would deem the Schiavone Company a public figure based upon its status as a corporation, or a public

contractor. Nor, however, can it find these factors irrelevant, and therefore adds them to the public figure equation. That equation leaves the court confident that plaintiffs are public figures, and that a finding to the contrary would violate the first amendment, and impermissibly chill the public right to comment on persons and matters which ought to be the subject of such dialogue.

### F. Malice

The *New York times v. Sullivan* Court held that the constitutional guarantees of the first amendment preclude recovery by a public official unless he can prove with "convincing clarity," 376 U.S. at 285–86, 84 S.Ct. at 728–29, that the statement at issue was made with "actual malice." *Id.* at 279–80, 84 S.Ct. at 725–26. Actual malice, in turn, has been defined as "knowledge that [such statement] was false or ... reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. at 726. Thus, constitutional protection is not available for the "calculated falsehood," or the false statement made with a high degree of awareness of its probable falsity. *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964).

The resulting standard is a subjective one. Thus "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). *See also Herbert v. Lando,* 441 U.S. 153, 156, 99 S.Ct. 1635, 1638, 60 L.Ed.2d 115 (1979), quoting *Gertz,* 418 U.S. at 335 n. 6, 94 S.Ct. at 3005 n. 6; *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153 (1967) (plurality opinion); *Time, Inc. v. Hill,* 385 U.S. 374, 389–90, 87 S.Ct. 534, 542–43, 17 L.Ed.2d 456 (1967); *McDowell, supra,* at

951; *Lawrence, supra,* 89 N.J. at 466, 446 A.2d 469. Such subjective test does not, however, preclude recovery based solely upon defendant's belief that his or her statement was true.

> The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant v. Thompson, supra,* 390 U.S. at 732, 88 S.Ct. at 1326 (footnote omitted). Common law malice, *i.e.,* "hatred, personal spite, ill will, or desire to injure," are not, of course, essential to the actual malice inquiry. *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 281, 94 S.Ct. 2770, 2779, 41 L.Ed.2d 745 (1974).

Defendant TIME here moves for summary judgment on the issue of malice. In so moving, it focuses not upon the statement in the article that "the name of Schiavone appeared several times in the bureau's reports on the 1975 disappearance of former Teamster Boss Jimmy Hoffa," but upon its decision to exclude the exculpatory language from the Webster memorandum which would have qualified or even neutralized such statement. In so doing, it relies upon comment b to Section 611 of the *Restatement (Second) of Torts,* which applies the *New York Times v. Sullivan* standard to fair report doctrine. After summarizing that standard, the comment states:

> The privilege stated in this Section permits a person to publish a report of an official action or proceeding or of a public meeting that deals with a matter of public concern, even though the report contains what he knows to be a false and defamatory statement. The constitutional requirement of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgement....

Defendant goes on to argue that the facts justified Smith's exclusion of the exculpatory statement "none of these suggested any criminality or organized crime associations," which had appeared in the Webster memorandum, in that there was ample evidence that, in fact, plaintiffs were involved in criminality and had organized crime associations. *See* Defendant's Brief (5/15/85) at 67–78.

■ The court finds this argument to misconceive the nature of the malice inquiry here at issue. As the court has already ruled, there is no basis for Smith's having abridged the Webster memorandum in the way he did: under any standard of liability,[15] it is clear that his editing of that memorandum rendered it an unfair and inaccurate rendition of what *appeared* in the Webster memorandum. As a result, TIME has lost the fair report privilege. Its attempt to resurrect it in the context of a summary judgment motion on the issue of malice must also fail.

This is so, first, because the language of the memorandum leaves a genuine issue of material fact as to whether Smith demonstrated actual malice in interpreting the Webster memorandum in a manner that allowed him to omit the exculpatory language because he had evidence of wrongdoing by plaintiffs not related to the HOFEX investigation. In fact, the statement that Schiavone "had appeared a number of times in reports in our HOFEX case, but that none of these suggested any criminality or organized crime associations" is most reasonably read as stating that none of the

---

**15.** Smith admits to having intentionally abridged the memorandum, for reasons of his own.

"times" in which Schiavone was referred to in the HOFEX case suggested wrongdoing. Even assuming the existence of the Schiavone references in the HOFEX files then, defendant could still be found liable for recklessly misconstruing the memorandum in order to leave out its exculpatory language.

Of course, there are, and were, no such references. *See supra* at 14–16, 35–38. An obvious and genuine dispute of material fact exists regarding whether Smith knew that such references did not exist; the evidence, however, tends to indicate that he did. His sources described such references as "missing," his own investigation failed to verify their existence, and the Special Prosecutor, and his staff informed him first that they knew of no such references and later, they claim, that such references did not exist. *See supra* at 10–11. Hence, at the very least, a genuine issue of material fact exists as to whether there were "obvious reasons to doubt the veracity" of the Webster memorandum in this regard. Hence, even if TIME was justified in excluding the exculpatory language of the memorandum, it may nonetheless be liable for including inculpatory language of doubtful veracity.

Plaintiffs set forth several other bases upon which the court could rely in denying the instant motion. *See* Plaintiffs' Brief (6/11/85) at 71–90. However, though it is possible that the above analysis could be buttressed by noting, for example, that Smith's actions could not be justified by a need to publish the story quickly, *i.e.*, it was not "hot news," *see, e.g., Curtis Publishing Co. v. Butts, supra,* 388 U.S. at 157, 87 S.Ct. at 1992; *Tavoulareas, supra,* 759 F.2d at 131–32, citing *Carson v. Allied News Co., supra,* 529 F.2d at 211; *Vandenburg v. Newsweek,* 507 F.2d 1024, 1026 (5th Cir.1975); *Goldwater v. Ginzburg,* 414 F.2d 324, 339 (2d Cir.1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); R. Sack, *supra,* § V.5.2.1., at 215–16, the court need not address plaintiffs' other contentions, for it merely rejects the logic and substance of defendant's argument. That argument is premised on a privilege that defendant has abused, and lost; nor can it justify even the reprinting of one falsehood when another, beneficial to plaintiffs, is selectively omitted.

From the facts before the court, a reasonable jury could find clear and convincing evidence of actual malice on the part of TIME. Defendant's motion for summary judgment on the issue of malice is denied. The parties are directed to meet and attempt to resolve their ongoing discovery dispute in light of this Opinion; if they cannot, such matter is referred to the United States Magistrate for disposition.

## CONCLUSION

Although the court has made substantial rulings in favor of the plaintiffs in this matter and has determined that a trial is necessary, it expresses its concerns nevertheless regarding the effects of libel actions on a free press. In order for public figures to prevail in libel actions, the threshold was raised based upon the belief that such persons had access to the media denied to the average person. Absent actual malice it was properly thought that battles over what was true and not true could and should be waged in the media rather than in the courts, and that the public rather than a jury would render the final verdict.

In this matter, as reflected by the press excerpts submitted to the court, there has been just such a public airing regarding Mr. Donovan and the Schiavone Company. Reports both favorable and unfavorable have been published and printed in the press and heard and seen on radio and television. Notwithstanding that expanded coverage with full opportunity to deny charges, report the favorable results of investigations and generally be heard, plaintiffs are about to launch a trial with all of its advance skirmishes and expense, which will focus on the deletion of *one* sentence from *one* memorandum in *one* article in *one* magazine. It is difficult to conceive how the plaintiffs even assuming that they will be successful in establishing

liability will be able to prove damages arising from this single article in the face of such widespread coverage of Mr. Donovan and his company. This action *may* result in a verdict favorable to the plaintiffs; but it may also, along with other defamation cases, result in a timorous and tentative press content to report on births, weddings, deaths and craft fairs. While it is essential to protect individuals from a powerful media which can destroy reputations forever through an abuse of that power, the greater danger lies in the destruction of the independence of the media itself.

This case presents questions of fact which require a trial on the merits for final disposition and may even demonstrate such an instance of media excess. However, the court wonders whether the cost to the litigants in this suit, the ultimate cost to the media from all such suits, and the final cost to the first amendment may be too expensive a price to pay.

Plaintiffs are directed to submit an order in conformity with this Opinion, consented to as to form.